## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **MICHAEL D. GOON,** | Case No.: 2:18-cv-01445-JLR |
| Plaintiff, | **PLAINTIFF'S NOTE AND MOTION TO COMPEL DISCOVERY** |
| vs. | **Noting Date: May 31, 2019** |
| **MICHAEL COLEMAN,** et al., | **Response Due: May 29, 2019** |
| Defendants. | **Reply Due: May 31, 2019** |
| | ***Clerk's Action Required*** |

Plaintiff **MICHAEL D. GOON,** through attorney of record **ADAM P. KARP** of **ANIMAL LAW OFFICES,** moves the court to compel Defendant **STATE OF WASHINGTON** to furnish unredacted copies of the Department of Corrections Emergency Management System Restricted Policy DOC 410.920 (Use of Force – Community Corrections).

## I. FACTS

### A. Amended Complaint Allegations

This suit arises from the November 30, 2017 slaying of Shilo, a now-deceased, five-year-old neutered male dog, by co-Defendant Michael Coleman, a DOC corrections officer, at the home of Mr. Goon in Maple Valley, Wash. On this date, Coleman and DOC Officer Holden Wilkinson came to Mr. Goon's premises not in response to a 911 call, nor to execute a warrant, nor to make an arrest, nor to investigate allegations of misconduct by Shilo or any resident therein. Rather, they arrived for an ORP investigation relative to Ryan Rodarte, the son of Mr.

**PLAINTIFF'S MOTION TO COMPEL**
**(2:18-cv-01445-JLR)** - 1

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 400-104 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

Goon's partner Leanne Taylor. Rodarte was to be work released to Goon's residence. They appeared unannounced, at an unexpected time, and without any opportunity for Mr. Goon or Ms. Taylor to either be home or to ensure that Shilo was away at the time of the contact.

DOC knew that Shilo was on premises before contact was made as Ms. Taylor spoke by phone to a DOC representative who asked if they had a dog and what breed. Ms. Taylor explained that they had rescued Shilo, a blue-nosed pit bull terrier type dog, when he was four months of age. The representative told Ms. Taylor that information would be mailed to her about the upcoming visit and a field officer would be in further contact in the next few weeks to schedule the actual inspection. Ms. Taylor and Mr. Goon received the letter but no person ever made further contact. Instead, Wilkinson and Coleman simply appeared without warning on November 30, 2017.

Further, there is reason to believe that Wilkinson and Coleman had been to the Goon residence a few days before, when Shilo no doubt would have been barking from inside, as Coleman's business card was left at the front door. It did not specify when DOC would return or indicate that Mr. Goon or Ms. Taylor should call back to schedule a time when they would be home. As captured by video, Wilkinson and Coleman entered the driveway in an unmarked car and in street clothes. At about 10:52:30, Coleman opened a closed chain link gate to enter the fenced front yard and pass down the walkway toward Mr. Goon's front door. Shilo's barking alerted Mr. Taylor, Ms. Taylor's brother, to the presence of Wilkinson and Coleman. Mr. Taylor opened the sliding glass door and saw two males on the porch. As he stepped out onto the porch, Shilo left the residence to greet Wilkinson and then continued to greet Coleman. About thirty seconds after Wilkinson and Coleman passed through the gate, Coleman discharged his firearm twice at Shilo, causing his death.

**PLAINTIFF'S MOTION TO COMPEL
(2:18-cv-01445-JLR)** - 2

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 400-104 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

The first shot penetrated Shilo's right tarsus, traveling 43° leftward and 8° downward, exiting his body into the second riser leading to the elevated porch toward Mr. Goon's front door. This shot caused Shilo to yelp in pain and try to run away. Shilo fled into the front yard, but as he passed Coleman, a second shot was fired, passing through Shilo's thorax. This shot mortally wounded Shilo by penetrating the left shoulder, traveling front to back, 37° rightward, 11° downward, about 1.5' through his body, puncturing his right lung and lodging in his muscle tissues. At the time of the shooting, Mr. Taylor was present and obviously desirous of regaining control of Shilo. Although not his owner, he was mere feet away at the time and could have been shot by Coleman's uncontrolled and feverish response. Shilo's slaying occurred on private property, behind a closed date, at a time when Wilkinson and Coleman were not invited guests and had no permission to enter or approach the front door, while a caretaker for Shilo was present.

Coleman failed to use less-lethal force and had plenty of time and notice to do so—based on DOC's prior conversation with Ms. Taylor, visiting the premises (again without permission) days prior, and otherwise hearing Shilo. His actions therefore fell below the standards expected of a prudent law enforcement officer. Given that Coleman confirms having fired only twice, and given the presence of a bullet in the second riser of the steps leading to Goon's front door, it follows that the ankle shot came <u>first</u>, passing through Shilo's body and into the stairs; the <u>second</u> shot entered Shilo's thoracic cavity, killing him at a time when Shilo was clearly not running directly at Coleman. The trajectories confirm he was actually trying to evade Coleman when fired upon. The video of the encounter bolsters this interpretation, in addition to Coleman's overreaction as he crushes the short metal fence and gate upon losing his balance when firing his weapon.

ANIMAL LAW OFFICES OF
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 400-104 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

Wilkinson was closest to Shilo at the time he emerged from the residence. But instead of drawing a firearm, he wielded a nonlethal Taser. Further, he did not discharge it, but let Shilo run past without incident. In an amazingly reckless maneuver, however, Coleman discharged his firearm in the general direction of not only his partner, but also Mr. Taylor, placing both in likely apprehension of being shot.  This is sadly consistent with Coleman's behavior five months prior on June 8, 2017 at the residence of Christopher Linville, 27319 220th Pl. SE, Maple Valley (which happens to be a few doors down from Mr. Goon). On that occasion, Wilkinson discharged his Taser at the same time Coleman discharged his firearm at Tuco, a dog he claimed was about to lunge at Wilkinson. When he fired the weapon, he jeopardized the safety of not only Wilkinson, but other individuals who were within close range. He also missed. Further, it was unnecessary as the Taser sufficed (with two cyclings) to neutralize Tuco's aggression. Wilkinson documented what he called "attack indicators" and found none in a second dog on scene (tail wagging, no barking, no bared teeth, calm demeanor, no hair on back on end, not jumping/lunging).

Wilkinson did not document any attack indicators for Shilo, who does not mention a rigid tail, barking, baring teeth, jumping, lunging, or raised hackles. In his report, Coleman only offers that Shilo had "direct eye contact" with him and was "3 to 5 feet away" when Coleman began running. He says Shilo "in an aggressive manner continue[d] to run towards [him]," but fails to explain how a running dog does so aggressively as opposed to nonaggressively. His narrative makes no mention of a stiff tail, barking, lunging, baring teeth, jumping, or hackles, either. Coleman thus imagined motivations that were not verified by objective facts. Notably, though within arm's reach of Shilo, at no time does he allege that Shilo tried to bite at or jump on him or Wilkinson. Instead of just petting him or stepping aside (as Wilkinson did), he loses control and

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 400-104 ● Bellingham, WA 98225
(888) 430-0001 ● Facsimile: (866) 652-3832
adam@animal-lawyer.com

retreats in a hysterical panic. The entire fiasco was avoidable had Coleman used common sense and opted for a less-lethal weapon (or even a flashlight, baton, or OC spray) instead of a deadly firearm. One would think he would have learned from the Tuco incident.

DOC Policy 410.920(II)(B)(1)(a) states that "OC and/or an ECD may be used to defend against animal attacks." OC means Oleoresin Capsicum and ECD means Electronic Control Devices used in Drive Stun mode. Coleman was trained in the use of OC on 11/3/11, 8/23/10, 9/14/09, and 9/29/08. Coleman was trained in the use of ECDs such as a Taser on 6/9/15 and 6/12/14. DOC investigated Shilo's shooting but did not discipline Coleman.

Several witnesses will testify that Shilo had never even so much as growled at a person before. Frequenting off-leash dog parks, including in Maple Valley's Lake Wilderness Park, encountering thousands of people and dogs with no hint of aggression, it will be evident that it is Coleman who has a violent propensity, not Shilo. Mr. Goon adopted Shilo from Motley Zoo Animal Rescue on May 12, 2012 for $400. He and his partner Leanne Taylor met Shilo at the Redmond Senior Center, where he sat patiently and curiously in his cage at the pet fair. Their eyes connected, and the adoption of the then-puppy was a foregone conclusion. Shilo became the glue of the family, including Leanne's daughter Rhegan, who stayed with her grandmother and missed school for a week after Shilo's death because it was too painful to come home. Shilo was Mr. Goon's *raison d'etre,* his rock. Less than one week before Shilo's death, Mr. Goon told his mother that when Shilo goes, it might just kill him. Shilo was the one being he absolutely needed in his life. In addition to caring for Shilo for six years, and Ms. Taylor buying him clothes and winning him toys from claw machines, Mr. Goon bought him a $2000 swim spa that, regrettably, he never got to use, and an 18' x 9' swimming pool so he could swim daily during the two summers before his death.

**PLAINTIFF'S MOTION TO COMPEL**
**(2:18-cv-01445-JLR) -  5**

ANIMAL LAW OFFICES OF
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 400-104 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

Shilo was well socialized. He welcomed guests on two or four legs, including Mr. Goon's employees and deliverypersons visiting the house daily. Shilo looked forward to meeting new people and loved going to Home Depot, Johnson's Home improvement, Mud Bay, and Kason's Pet Supply. Basically everywhere he was well-received and highly socialized to humans. While they took him to many dog parks, where he would occasionally be ambushed by aggressive dogs, he never engaged and never bit anything or anyone. He was admired by almost all other pet owners for his gentle and playful nature. Shilo's favorite activity was swimming at the lake or diving for rocks. He would swim out to the middle of the lake, splash about, and make circles, treading for up to an hour. When water was near, he ignored people, dogs, and birds to feverishly hunt rocks at the lake's bottom.

Mr. Goon and Ms. Taylor vacationed rarely without him. Mr. Goon even rented a car in the summer of 2015 to drive to Vermont for a family reunion just so he could come with. His family looked forward to his arrival as if Shilo were Mr. Goon's child. When they stopped at Niagara Falls, you would have thought he was the main attraction. People (mostly children) swarmed to greet him and to have their picture taken with him; he was a perfect gentleman. While walking the streets of New York where there was limited dog space and the pavement was 100+ degrees, Ms. Taylor and Goon took turns *carrying* their baby as his paws were already damaged by the zebra clams in Lake Champlain. When it came to Shilo's health, Goon spared no expense. He and Ms. Taylor made several trips to the veterinarian for well checks, once to have a fatty tumor removed and biopsied, and stitches on his neck when he was attacked by another dog. Goon only bought Acana's grain free food at $65 a bag, supplemented with all natural canned food from Mud Bay.

Shilo and Mr. Goon would trail walk a few times a week off-leash, and Ms. Taylor loved

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 400-104 ● Bellingham, WA 98225
(888) 430-0001 ● Facsimile: (866) 652-3832
adam@animal-lawyer.com

taking Shilo to Lake Wilderness Park to swim. Even at Marymoor's 40-acre off-leash dog park, Shilo never was more than a stone's throw away. He would run down the trail and stop to turn around to make sure Goon was keeping up, then make a beeline for the water. Of the hundreds of dogs there, he was always the best swimmer, swimming circles in the middle while other canines would hang out at the shore. It was the only time he would not respond immediately when called, which made Goon laugh: a stubborn child doing the thing he loved most. Shilo served as a therapy dog to Ms. Taylor, a trait that Mr. Goon valued because of his love for Taylor.

Mr. Goon retained tissue samples from Shilo in order to begin the process of cloning, at an expense of $50,000. While it will not produce a perfect simulacrum of Shilo, it is nonetheless an effort to mitigate the tremendous loss suffered. Goon lost the intrinsic value of Shilo, based on his unique qualities, characteristics, behaviors, personality, training, and bond, as well as the loss of his utility, companionship, love, affection, protection, and solace. At the time of his death, Shilo had no fair market value and could not be replaced or reproduced. Any reasonable person in Mr. Goon's position would not willingly have sold Shilo at the time just prior to Shilo's death. At that moment, and thereafter, Shilo had an immense intrinsic value to Mr. Goon. Shilo and Goon formed a strong relationship, causing Shilo to fundamentally change under his care. Shilo was a close family companion and had special value, aiding Goon in his enjoyment of life, well-being, growth, development, work and/or daily activities. Goon experienced severe emotional distress from the acts and omissions identified herein. *Amended Cmpt.,* passim. (Dkt. 4).

### B. Disputed Discovery and FRCP 37(A)(1) Conference

Through public disclosure and as part of the FRCP 26(a)(1) disclosures, Defendants produced a redacted version of Restricted Policy 410.920 (attached). Mr. Karp and Chris Clay, counsel for Defendants, conferred by email and phone concerning the redactions, even

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 400-104 ● Bellingham, WA 98225
(888) 430-0001 ● Facsimile: (866) 652-3832
adam@animal-lawyer.com

postponing a scheduled FRCP 30(b)(6) deposition until the matter of redaction could be explored further. Consistent with their professional relationship in resolving disputes informally when possible, Mr. Clay agreed that a formal RFP need not be propounded for the unredacted version of Policy 410.920. Despite the discovery conference and good faith efforts at resolution, they remained at an impasse, despite Mr. Karp offering a protective order. The DOC takes the position that officer safety requires that the redactions remain and would not negotiate. While Mr. Karp and Mr. Goon of course with no harm to befall DOC officers, the death of Shilo warrants inquiry, particularly where a moving force behind the shooting (and potential proof that both Coleman broke from policy and the DOC nonetheless ratified that departure) is Policy 410.920, which specifically addresses the deployment of force against dogs (Policy 410.920(II)(B)(1)(a)).

Redacted information sought to be released by court order includes:

- Directive I(A)(1) and Use of Force Options (Attachment 2)

- Directive II(A)(1-4): Force Options

- Directive II(B)(2)(a-b): Control Tactics – OC aerosols

- Directive II(D)(2)(a)(1-3): Restrictions on the Use of Firearms – guidelines

These force options, including the sequencing, ranking, and restrictions placed upon such deployment selections, pertain to and resulted in the killing giving rise to this action. Assuredly relevant and probative of not only direct, but also possibly vicarious *Monell,* claims, the subject matter of Policy 410.920 is both discoverable and admissible. Mr. Goon has already offered to adhere to a reasonable protective order but the State has offered none, instead refusing to release any redacted information without court order. Under the circumstances, such position is untenable and should not be countenanced.

**PLAINTIFF'S MOTION TO COMPEL**
**(2:18-cv-01445-JLR)** - 8

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 400-104 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

## II. AUTHORITY AND CONCLUSION

Prior to bringing a motion to compel, LCR 37(a)(1) requires a meet-and-confer conference, which occurred on May 3, 2019. Unfortunately, it did not resolve the matter. Mr. Goon accordingly seeks an order compelling production of the unredacted policy per FRCP 37(a)(3)(B)(iv). Though entitled to fees, as a professional courtesy, they are not sought on this motion. However, an expedited ruling is desired so that depositions can proceed of the State's FRCP 30(b)(6) representative and both Coleman and Wilkinson with the unredacted policy in hand to discuss and achieve meaningful discovery.

Dated this May 14, 2019.

ANIMAL LAW OFFICES

*/s/ Adam P. Karp*

_____
Adam P. Karp, WSBA No. 28622
*Attorney for Plaintiff Michael D. Goon*

## LCR 37 CERTIFICATION

I certify that I participated in good faith in an LCR 37 discovery conference with Chris Clay on May 3, 2019 to discuss the matters raised by this motion.

*/s/ Adam P. Karp*

_____
Adam P. Karp, WSBA No. 28622

## CERTIFICATE OF SERVICE

I certify having served the foregoing note and motion upon the individual identified below in the manner stated on May 14, 2019:

**Via ECF and Email (5.14.19)**
Christopher Clay
Assistant Attorney General

**PLAINTIFF'S MOTION TO COMPEL
(2:18-cv-01445-JLR)** - 9

Washington State Attorney General's Office
PO Box 40126
Olympia, WA  98504-0126
Chris.clay@atg.wa.gov
Debbie.thomas@atg.wa.gov
Kathy.lake@atg.wa.gov
torolyef@atg.wa.gov

*/s/ Adam P. Karp*

_____

Adam P. Karp, WSBA No. 28622

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 400-104 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com


**REVIEW/REVISION HISTORY:**

Effective:    8/25/04
Revised:      6/23/05
Revised:      5/5/08
Revised:      9/2/08 AB 08-024
Revised:      1/1/09 AB 08-037
Revised:      2/24/09 AB 09-006
Revised:      7/13/09
Revised:      11/16/09
Revised:      2/1/12
Revised:      10/1/14

**SUMMARY OF REVISION/REVIEW:**

Added Statewide Programs/Work Release Administrator references throughout
II.B.1. and Attachment 2 - Adjusted control tactics force options
Added II.B.2. on OC aerosol products
II.C. and Attachment 2 - Added language on impedance tactics
V.B. and VI.C.2. - Added clarifying language throughout
VI.A.3.b. & B.4.c.4) and Attachment 1 - Added language on replacement firearms following a discharge
VII.B.1.a. & 3. - Adjusted language for clarification

**APPROVED:**

_Bernard Warner (signature)_

_____          8/22/14
**BERNARD WARNER**, Secretary                 Date Signed
Department of Corrections

Goon v DOC
04240001



STATE OF WASHINGTON
DEPARTMENT OF CORRECTIONS

**RESTRICTED**
*EMERGENCY MANAGEMENT SYSTEM*
**POLICY**

| APPLICABILITY |
| **WORK RELEASE/FIELD** |

| REVISION DATE | PAGE NUMBER | NUMBER |
| 10/1/14 | 2 of 10 | **DOC 410.920** |

| TITLE |
| **USE OF FORCE - COMMUNITY CORRECTIONS** |

**REFERENCES:**

DOC 100.100 is hereby incorporated into this policy; RCW 9.94.050; RCW 9A.16.020(1); RCW 9A.16.040; WAC 139-10-550; ACA 2B-01; ACA 2B-02; ACA 2B-03; DOC 400.100 Incident and Significant Event Reporting; DOC 400.110 Reporting and Reviewing Critical Incidents; DOC 410.040 Incident Command System (ICS); DOC 410.215 Electronic Control Device (ECD) - Community Corrections; DOC 410.220 Firearms Program - Community Corrections; DOC 410.930 Community Corrections Use of Force Training; Collective Bargaining Agreement; Records Retention Schedule

**POLICY:**

I.     The Department has authorized employees to use force in the performance of their legal duties.

II.    Employees may only use the amount of force reasonably necessary to affect the lawfully intended purpose based on the totality of circumstances.

III.   All employees involved in a use of force situation will use techniques consistent with their training.

IV.    Employees will exercise good judgment, discipline, caution, and objective reasonableness when using force.

**DIRECTIVE:**

I.     Use of Force Options

    A.     The amount of force reasonably necessary is determined by the nature of the given situation and the totality of the facts and circumstances known to the employee at the time force is used.

        1.     Use of Force Options (Attachment 2) serves as a guide for determining reasonable force options based on a perceived level of resistance.

    B.     The following criteria should be followed when the use of force is necessary:

        1.     All reasonable steps should be taken to de-escalate or prevent any incident that would likely result in the use of force,

        2.     Resistance must be evident to justify the use of force, and

        3.     If an aggressor's actions present an undue risk of harm and all employees involved in the situation can safely withdraw, they may do so.

Goon v DOC
04240002

II.     Force Options

    A.     Presence and verbal commands will continue throughout the following force options:

        1. ███████████████████
        2. ███████████████████
        3. ███████████████████
        4. ███████████████████

    B.     Control Tactics

        1.     The control tactics force option includes the use of Oleoresin Capsicum (OC) and an Electronic Control Device (ECD) used in Drive Stun mode.

            a.     OC and/or an ECD may be used to defend against animal attacks.

        2.     OC aerosols that are approved for use are Defense Technology's First Defense products.  No other aerosol products will be authorized without specific written approval from the Assistant Secretary for Community Corrections.

            a.     For duty carry, the ████████████████████ ██████ are the only authorized products.

            b.     For employee OC training and exposures, aerosol products that are ████████████████ should be used.

    C.     Impedance Tactics

        1.     The impedance tactics force option includes the use of an ECD in Probe Deployment mode.

    D.     Use of Deadly Force

        1.     Community Corrections employees authorized to be armed per DOC 410.220 Firearms Program - Community Corrections may use deadly force to:

            a.     Discharge a legal duty, which includes the following:

                1)     To apprehend an offender under supervision who has a valid arrest warrant or who has committed, attempted to commit, is committing, or is attempting to commit a felony, if the

Goon v DOC
04240003



offender presents a substantial risk of death or serious bodily injury to the employee or another person.

   2) To prevent escape of an offender from a total confinement, medium or higher custody facility.

   3) To apprehend an offender who has escaped from a total confinement, medium or higher custody facility.

   b. Defend themselves or other employees against a substantial risk of death or serious bodily injury.

   c. Defend another person against a substantial risk of death or serious bodily injury if the aggressor is an offender.

   d. Assist a law enforcement officer when acting under the law enforcement officer's direction.

2. Restrictions on the Use of Firearms

   a. Employees will adhere to the following guidelines:

      1)
      2)

      3)

3. Drawing or Displaying a Firearm

   a. The decision to draw a firearm should be based on the totality of circumstances present at the scene and the determination that deadly force is reasonably necessary to defend oneself or another against a substantial risk of death or serious bodily injury.

   b. When the employee has gained control of the situation or withdrawn from the scene and the threat has subsided, s/he will re-holster his/her firearm when safe to do so.

III. Self Defense

   A. When there is a substantial risk of death or serious bodily injury, employees/ contract staff may use any reasonable means necessary to stop the action.

Goon v DOC
04240004



B.   All employees/contract staff at the scene of a use of force incident involving Department employees/contract staff and/or offenders will attempt to provide assistance in the defense of another person by:

1.   Calling or summoning additional employees/contract staff to the scene and notifying law enforcement,
2.   Issuing a verbal command to stop the action, and
3.   Assisting in controlling or stopping an offender or other aggressor.

C.   Armed employees may discharge a firearm at an animal when necessary in self-defense or defense of others in the course of discharging a legal duty.

IV.   Medical Aid

A.   [2B-01] [2B-02]  If necessary, and as safety permits, medical aid and/or emergency medical service will be summoned/rendered as soon as possible.

1.   In cases where an offender declines medical aid, the reporting employee/contract staff will document the refusal in the offender's electronic file, including the name of the responding emergency medical service.

V.   [2B-03]  Reporting

A.   The supervisor will be notified as soon as possible when employees/contract staff are involved in any use of force situation.

B.   [2B-01]  A report will be submitted in the Incident Management Reporting System (IMRS) when:

1.   Any force is used,
2.   A firearm or ECD is discharged outside of training, and
3.   A firearm is used for anything other than its intended purpose.

C.   For firearm discharges directed at animals, the Statewide Programs/Work Release Administrator or Field Administrator (FA) will review the incident and determine if other actions are required.

D.   Each employee/contract staff involved in a use of force situation will:

1.   Notify his/her supervisor,

2.   Provide an initial verbal statement of the incident before going off duty, unless directed otherwise by his/her supervisor or higher authority, and

Goon v DOC
04240005



3. [2B-01] Complete DOC 21-984 Community Corrections Use of Force Report within 72 hours of the incident. Reports should be written individually to describe each employee/contract staff's own involvement.

    a. The narrative will describe:

        1) In detail, the circumstances warranting the need for force, including the statements and actions of the suspect(s) that warranted the need for force,

        2) In detail, the exact force used and why certain force options were chosen, and

        3) The physical condition of the suspect(s), noting any apparent injuries, complaint of injuries, or the absence of injuries.

E. The use of force packet will be reviewed by the supervisor and forwarded to the Statewide Programs/Work Release Administrator or FA.

F. Employees may have a representative assist in preparing the incident report and be present during the investigation consistent with the Collective Bargaining Agreement.

VI. Discharge of a Firearm Resulting in Death or Serious Bodily Injury

A. When a firearm is discharged resulting in death or serious bodily injury, and after it is safe to do so:

1. Law enforcement must be notified. The Department will cooperate with independent law enforcement investigations.

2. On-scene employees should initiate the Firearms Discharge Process - Community Corrections Emergency Checklist (Attachment 1).

3. The firearm and all associated material will be secured as a crime scene at the incident site and will not be released until directed by law enforcement.

    a. If law enforcement releases the firearm and related material, it will be inventoried, secured, and preserved as evidence until released by the Statewide Programs/Work Release Administrator or FA.

    b. The Assistant Secretary for Community Corrections may authorize the employee to be issued a replacement firearm.

Goon v DOC
04240006



4.     The employee(s) will be placed on administrative leave.

B.     Upon notification that a firearm has been discharged outside of training, the supervisor/designee will immediately respond to the scene, and:

1.     Confirm law enforcement has been notified,

2.     Make immediate notifications per DOC 400.100 Incident and Significant Event Reporting,

3.     If the discharge resulted in the death or serious bodily injury to a person, secure the discharged firearm(s) and assist in securing the scene, if not already accomplished, and

4.     Send the employee(s) to a local hospital, or similar location, with a co-worker to:

a.     Be monitored for any medical complications,
b.     Provide the urine sample, if required, and
c.     Afford him/her an opportunity, away from media and the public, to:

1)     Change clothes if his/hers are surrendered as evidence,

2)     Make a telephone call home to confirm his/her safety,

3)     Meet with Department employees, a Critical Incident Stress Management (CISM) team member, and/or family, and

4)     If authorized, be issued a replacement firearm.

C.     Supervisors will:

1.     Review all documentation submitted by the employee(s) before going off duty, and document any injury sustained by all employees/contract staff, however minor.

2.     Submit a report in IMRS that includes a:

a.     Brief description of the incident,

b.     Detailed description of the force used by the employee(s) and suspect(s), including physical aggression and resistance by the suspect(s), and any relevant verbal statements and/or body language,

Goon v DOC
04240007



     c.    Detailed description of all incident related injuries sustained by employees/contract staff, including all apparent injuries, complaints of injuries, or the absence of injuries,

     d.    Detailed description of the physical condition of the suspect(s), noting any apparent or reported injuries,

     e.    Notation of whether the suspect(s) declined medical aid and to whom the refusal was made (e.g., EMS, Fire), if applicable.

     f.    List of all witnesses, Department employees/contract staff, law enforcement officers, and other agencies/departments that responded to or were at the scene.

D.    The Statewide Programs/Work Release Administrator or FA will review all use of force incident reports.

    1.    The Statewide Programs/Work Release Administrator or FA will retain all completed DOC 21-984 Community Corrections Use of Force Reports per the Records Retention Schedule.

VII.   Incident Review

A.    The Department may conduct a formal critical incident review per DOC 400.110 Reporting and Reviewing Critical Incidents.

B.    The Statewide Programs/Work Release Administrator or FA will convene a Firearms Incident Review Board to investigate and review all incidents involving the discharge of a firearm.

    1.    The Statewide Programs/Work Release Administrator or FA will chair the Board, which should consist of the following members who are not the employee's immediate supervisor or in his/her work unit:

     a.    Community Corrections Officer/Specialist authorized to carry a firearm,
     b.    Community Corrections Supervisor,
     c.    Emergency Operations Unit employee,
     d.    Certified Firearms Instructor,
     e.    Bargaining unit representative, as appointed by the Union Management Communications Committee, and
     f.    Additional members as assigned by the Statewide Programs/Work Release Administrator or FA.

Goon v DOC
04240008

| | APPLICABILITY | | |
|---|---|---|---|
| STATE OF WASHINGTON DEPARTMENT OF CORRECTIONS | **WORK RELEASE/FIELD** | | |
| | REVISION DATE 10/1/14 | PAGE NUMBER 9 of 10 | NUMBER **DOC 410.920** |
| **RESTRICTED** EMERGENCY MANAGEMENT SYSTEM **POLICY** | TITLE **USE OF FORCE - COMMUNITY CORRECTIONS** | | |



2.      The Board will conduct a full investigation of the incident, which should include:

       a.      Review of written reports,

       b.      Interviews of individuals and witnesses involved,

       c.      Analysis of the totality of circumstances which led to the use of a firearm,

       d.      Review of compliance with Department policies, local ordinances, and other jurisdictional requirements,

       e.      Review of adequacy of relevant policies, training, and equipment, and

       f.      Determination of need for remedial training or re-certification for use of firearms.

3.      The employee who discharged the firearm will receive all documents related to the incident that will be reviewed by the Board no less than 48 hours before the scheduled meeting date.

C.      Employees may have a representative present during any investigation consistent with the Collective Bargaining Agreement.

D.      The Assistant Secretary for Community Corrections will review critical incident reviews and report findings, use of firearms incident reports, and investigations.

E.      Following the review, all reports will be forwarded to the Risk Management Office and maintained per the Records Retention Schedule.

VIII.   Return to Duty

A.      Following the discharge of a firearm that resulted in death or serious bodily injury, the Statewide Programs/Work Release Administrator or FA may recommend returning the employees(s) to duty when the following has been considered and reviewed:

1.      Local prosecutor has completed the investigation,
2.      Post-trauma debriefing,
3.      Employee has undergone and passed a fitness for duty evaluation, and
4.      Review by the Attorney General's Office.

Goon v DOC
04240009



STATE OF WASHINGTON
DEPARTMENT OF CORRECTIONS

*RESTRICTED*
*EMERGENCY MANAGEMENT SYSTEM*
**POLICY**

| APPLICABILITY **WORK RELEASE/FIELD** | | |
|---|---|---|
| REVISION DATE 10/1/14 | PAGE NUMBER 10 of 10 | NUMBER **DOC 410.920** |
| TITLE **USE OF FORCE - COMMUNITY CORRECTIONS** | | |

B.   The Statewide Programs/Work Release Administrator or FA may also order a fitness for duty evaluation(s) on other impacted employees involved in the incident.

C.   The Assistant Secretary for Community Corrections will review the totality of circumstances and make the final determination for the employee's return to duty.

IX.   Legal Representation

A.   An employee who uses deadly force and retains an attorney may be eligible for reimbursement of attorney costs up to $2,500.00, if at the end of the legal process no administrative or criminal charges are sustained against the employee.

B.   The Assistant Secretary for Community Corrections may authorize additional reimbursement if the prosecutor has ruled the incident a justifiable use of deadly force.

**DEFINITIONS:**

The following words/terms are important to this policy and defined in the glossary section of the Emergency Management System Policy Manual:  Deadly Force, Serious Bodily Injury, Use of Force.  Other words/terms appearing in this policy may also be defined in the glossary.

**ATTACHMENTS:**

Firearms Discharge Process - Community Corrections Emergency Checklist (Attachment 1)
Use of Force Options (Attachment 2)

**DOC FORMS:**

DOC 21-984 Community Corrections Use of Force Report

Goon v DOC
04240010

# FIREARMS DISCHARGE PROCESS -
## COMMUNITY CORRECTIONS
### EMERGENCY CHECKLIST

| Location: | | Date: |
|---|---|---|
| Incident Commander: | | Time: |

Required Actions:

| **Involved Employee(s) at Incident Site:**<br>***All actions are prefaced by "when it is safe to do so"***<br><br>**4. Resolve** | **Time Started** | **Time Completed** | **Initial** | **N/A** |
|---|---|---|---|---|
| a. Control any remaining threat to employee safety | | | | |
| b. Assume command of the incident until relieved | | | | |
| c. Verify information if unclear | | | | |
| d. Notify law enforcement, including:<br> • Name<br> • Address of incident<br> • What happened<br> • Who is involved<br> • Injuries | | | | |
| e. Assess injuries and provide emergency first aid and assistance as necessary | | | | |
| f. Notify Supervisor<br> • Supervisor/designee and/or the Statewide Programs/Work Release Administrator or Field Administrator will immediately respond to incident site<br> • Supervisor/designee and/or the Statewide Programs/Work Release Administrator or Field Administrator will ensure the incident is verbally reported per DOC 400.100 Incident and Significant Event Reporting as soon as practical | | | | |
| g. Before law enforcement arrives, secure the perimeter and incident site:<br> • Secure the entire crime scene (protection of any and all evidence)<br> • Secure all firearms and associated material (e.g., ejected cartridges, unspent ammunition, etc.)<br> • Secure other weapons at incident site<br> • Ensure all suspects are searched and restrained<br> • Ensure names of all persons entering the secure perimeter are recorded | | | | |

Goon v DOC
04240011

# FIREARMS DISCHARGE PROCESS -
## COMMUNITY CORRECTIONS
### EMERGENCY CHECKLIST

| | | | | |
|---|---|---|---|---|
| h. Assess property damage | | | | |
| i. Identify all involved personnel and possible witnesses | | | | |
| j. If the firearm and associated material is released by law enforcement, inventory all and preserve in evidence locker | | | | |
| k. All employees will remain at the incident site until released by law enforcement | | | | |
| l. Once released from the scene, ensure the employee who discharged the firearm resulting in injury or death is:<br>• Accompanied to a local hospital (or other similar place) to:<br>  ✓ Be monitored for medical complications<br>  ✓ Provide a urine sample, if required<br>  ✓ Provide an opportunity, away from the media and public, to:<br>    ○ Change clothing, if necessary<br>    ○ Contact family<br>    ○ Meet with Department employees, Critical Incident Stress Management (CISM) team member, and/or family<br>    ○ If applicable, be issued a replacement firearm<br>• Advised that they have the right to consult with legal counsel and/or union representative before providing details of the incident<br>• Placed on administrative leave pending investigation | | | | |
| m. Ensure all employees/contract staff involved are offered CISM services | | | | |

Notes:

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

Goon v DOC
04240012

CONFIDENTIAL

# FIREARMS DISCHARGE PROCESS -
## COMMUNITY CORRECTIONS
### EMERGENCY CHECKLIST

Goon v DOC
04240013

# USE OF FORCE OPTIONS



DOC 410.920 Attachment 2

Goon v DOC
04240014