

**ANIMAL LAW OFFICES
OF ADAM P. KARP, JD, MS**
114 W. Magnolia Street, Suite 400-104
Bellingham, Washington 98225

**Bellingham:** (360) 738-7273
**Outside Bellingham:** (888) 430-0001
**E-Fax**: (866) 652-3832
**Email**: adam@animal-lawyer.com
**Web**: www.animal-lawyer.com
*Licensed in Washington, Oregon, and Idaho*

**By ECF**

Tuesday, May 21, 2019

The Honorable James L. Robart
United States Courthouse
700 Stewart St., Ste. 14128
Seattle, WA 98101
(206) 370-8920

**Ref.:** *Goon v. State*, **2:18-cv-01445-JLR**
**RE:** **Plaintiff's Position on Discovery Dispute**

Dear Judge Robart,

    This suit arises from the November 30, 2017 slaying of Shilo, a now-deceased, five-year-old neutered male dog, by co-Defendant Michael Coleman, a DOC corrections officer, at the home of Mr. Goon in Maple Valley, Wash. On this date, Coleman and DOC Officer Holden Wilkinson came to Mr. Goon's premises not in response to a 911 call, nor to execute a warrant, nor to make an arrest, nor to investigate allegations of misconduct by Shilo or any resident therein. Rather, they arrived for an ORP investigation relative to Ryan Rodarte, the son of Mr. Goon's partner Leanne Taylor. Rodarte was to be work released to Goon's residence. They appeared unannounced, at an unexpected time, and without any opportunity for Mr. Goon or Ms. Taylor to either be home or to ensure that Shilo was away at the time of the contact.

    DOC knew that Shilo was on premises before contact was made as Ms. Taylor spoke by phone to a DOC representative who asked if they had a dog and what breed. Ms. Taylor explained that they had rescued Shilo, a blue-nosed pit bull terrier type dog, when he was four months of age. The representative told Ms. Taylor that information would be mailed to her about the upcoming visit and a field officer would be in further contact in the next few weeks to schedule the actual inspection. Ms. Taylor and Mr. Goon received the letter but no person ever made further contact. Instead, Wilkinson and Coleman simply appeared without warning on November 30, 2017.

As captured by video, Wilkinson and Coleman entered the driveway in an unmarked car and in street clothes. At about 10:52:30, Coleman opened a closed chain link gate to enter the fenced front yard and pass down the walkway toward Mr. Goon's front door. Shilo's barking alerted Mr. Taylor, Ms. Taylor's brother, to the presence of Wilkinson and Coleman. Mr. Taylor opened the sliding glass door and saw two males on the porch. As he stepped out onto the porch, Shilo left the residence to greet Wilkinson and then continued to greet Coleman. About thirty seconds after Wilkinson and Coleman passed through the gate, Coleman discharged his firearm twice at Shilo, causing his death. At the time of the shooting, Mr. Taylor was present and obviously desirous of regaining control of Shilo. Although not his owner, he was mere feet away at the time and could have been shot by Coleman's uncontrolled and feverish response. Shilo's slaying occurred on private property, behind a closed gate, at a time when Wilkinson and Coleman were not invited guests and had no permission to enter or approach the front door, while a caretaker for Shilo was present.

Wilkinson did not document any attack indicators for Shilo. Coleman says Shilo "in an aggressive manner continue[d] to run towards [him]," but fails to explain how a running dog does so aggressively as opposed to nonaggressively. His narrative makes no mention of a stiff tail, barking, lunging, baring teeth, jumping, or hackles, either. Notably, though within arm's reach of Shilo, at no time does he allege that Shilo tried to bite at or jump on him or Wilkinson. Instead of just petting him or stepping aside (as Wilkinson did), he loses control and retreats in a hysterical panic. The entire fiasco was avoidable had Coleman used common sense and opted for a less-lethal weapon (or even a flashlight, baton, or OC spray) instead of a deadly firearm.

DOC Policy 410.920(II)(B)(1)(a) states that "OC and/or an ECD may be used to defend against animal attacks." OC means Oleoresin Capsicum and ECD means Electronic Control Devices used in Drive Stun mode. Coleman was trained in the use of OC on 11/3/11, 8/23/10, 9/14/09, and 9/29/08. Coleman was trained in the use of ECDs such as a Taser on 6/9/15 and 6/12/14. DOC investigated Shilo's shooting but did not discipline Coleman.

Through public disclosure and as part of the FRCP 26(a)(1) disclosures, Defendants produced a redacted version of Restricted Policy 410.920 (attached). Mr. Karp and Chris Clay, counsel for Defendants, conferred by email and phone concerning the redactions, even postponing a scheduled FRCP 30(b)(6) deposition until the matter of redaction could be explored further. Consistent with their professional relationship in resolving disputes informally when possible, Mr. Clay agreed that a formal RFP need not be propounded for the unredacted version of Policy 410.920. Despite the discovery conference and good faith efforts at resolution, they remained at an impasse, despite Mr. Karp offering a protective order. While Mr. Karp and Mr. Goon of course wish no harm to befall DOC officers, the death of Shilo warrants inquiry, particularly where a moving force behind the shooting (and potential proof that both Coleman broke from policy and the DOC nonetheless ratified that departure) is Policy 410.920, which specifically addresses the deployment of force against dogs (Policy 410.920(II)(B)(1)(a)).

These force options, including the sequencing, ranking, and restrictions placed upon such deployment selections, pertain to and resulted in the killing giving rise to this action. Assuredly relevant and probative of not only direct, but also possibly vicarious *Monell,* claims, the subject matter of Policy 410.920 is both discoverable and admissible.

Respectfully submitted,

ANIMAL LAW OFFICES

_____
Adam P. Karp, Esq.

Encl.: As stated