UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL D. GOON,

               Plaintiff,

    v.

MICHAEL COLEMAN, et al.,

               Defendants.

CASE NO. C18-1445JLR

ORDER GRANTING IN PART
MOTION FOR SUMMARY
JUDGMENT AND DISMISSING
STATE LAW CLAIMS
WITHOUT PREJUDICE

## I.  INTRODUCTION

There are two motions before the court:  (1) Defendants Michael Coleman,
Washington State Department of Corrections ("DOC"), and State of Washington's
(collectively, "Defendants") motion for summary judgment (MSJ (Dkt. # 30); *see also*
MSJ Reply (Dkt. # 45)); and (2) Plaintiff Michael D. Goon's motion to exclude the
testimony of one of Defendants' expert witnesses, Ron Berman (MTE (Dkt. # 27); *see
also* MTE Reply (Dkt. # 36)).  Defendants and Mr. Goon filed responses to the respective
motions.  (*See* MSJ Resp. (Dkt. # 43); MTE Resp. (Dkt # 34).)  The court has considered

the motions, the parties' submissions concerning the motions, the relevant portions of the record, and the applicable law.[1] Being fully advised, the court GRANTS in part Defendants' motion for summary judgment on Mr. Goon's 42 U.S.C. § 1983 claim and DECLINES to rule in part on Defendants' motion for summary judgment regarding Mr. Goon's state law claims. Having granted summary judgment on Mr. Goon's only federal claim, the court DECLINES to exercise supplemental jurisdiction over Mr. Goon's remaining state law claims and therefore DISMISSES those claims without prejudice and DENIES Mr. Goon's motion to exclude Mr. Berman as moot.

//

---

[1] Mr. Goon requests oral argument on the motion for summary judgment. (*See* MSJ Resp. at 1.) A district court's denial of a request for oral argument on summary judgment does not constitute reversible error in the absence of prejudice. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v. Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)). There is no prejudice in refusing to grant oral argument where the parties have ample opportunity to develop their legal and factual arguments through written submissions to the court. *Id.* ("When a party has an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument] . . . .") (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*). Mr. Goon has provided the court with lengthy written submissions and supporting documentation in opposition to Defendants' motion for summary judgment. (*See* MSJ Resp.; MSJ Resp. at 22-107 ("1st Karp Decl."), Exs. A-D; Goon Decl. (Dkt. # 39); Leanne Taylor Decl. (Dkt. # 40); Thomas Decl. (Dkt. # 41); Ward Decl. (Dkt. # 42); 2d Karp Decl. (Dkt. # 44).) Mr. Goon has also submitted substantive evidence in support of his motion to exclude Mr. Berman. (*See* MTE; MTE Reply; 1st Crosby Decl. (Dkt. # 28); 2d Crosby Decl. (Dkt. # 29).) Defendants have also submitted briefing, additional deposition testimony, and partial video footage of the shooting. (*See* MSJ; MSJ Reply; Clay Decl. (Dkt. # 31), Exs. A-F.) Given that the court has sufficient written materials to decide this motion, the court has determined that oral argument would not be of assistance. *See* Local Rules W.D. Wash. LCR 7(b)(4). Moreover, as discussed below, *see infra* § III.A.4, although the court grants summary judgment on Mr. Goon's 42 U.S.C. § 1983 claim on qualified immunity grounds, the court dismisses the remainder of Mr. Goon's state law claims without prejudice under 28 U.S.C. § 1367. *See* 28 U.S.C. § 1367(c)(3). As such, Mr. Goon may adjudicate the remainder of his state claims in state court, which further limits the possibility of prejudice to Mr. Goon. Thus, the court DENIES Mr. Goon's requests for oral argument.

## II.    BACKGROUND

This case arises from unfortunate facts.  On November 30, 2017, Defendant Michael Coleman—an officer with the DOC—fatally shot Plaintiff Michael Goon's dog, Shilo.[2]  (*See* Am. Compl. (Dkt. # 4) ¶¶ 12, 18; Answer (Dkt. # 12) ¶¶ 12, 18 (admitting Mr. Goon's allegation that Officer Coleman shot and killed Shilo on November 30, 2017).[3])  Shilo was a five-year old, 97-pound, neutered male pit bull.  (*See* Am. Compl. ¶ 5; Clay Decl. ¶ 3, Ex. A ("Goon Dep.") at 15:13-18; Ward Decl. at 9-10 ("Necropsy Rpt.")

At some point in 2017, Mr. Goon's partner, Leanne Taylor, filed paperwork with the DOC in an attempt to obtain authorization for her son, Ryan Rodarte, to be work released to the home that she shared with Mr. Goon.  (*See* Leanne Taylor Decl. ¶ 2; Clay Decl. ¶ 5, Ex. C ("Leanne Taylor Dep.") at 12:1-18.)  The parties refer to this process as the Offender Release Program ("ORP") inspection.  (*See* Clay Decl. ¶ 6, Ex. D ("Coleman Dep."[4]) at 65:9-18, 82:10-20; Leanne Taylor Decl. ¶ 2.)  In order for Mr. Rodarte to be released to Ms. Taylor's home as part of the ORP, the DOC required a

---

[2] The evidence submitted by the Defendant is inconsistent on whether Mr. Goon's dog was named Shilo or Shiloh.  (*Compare* Goon Decl. (spelling the dog's name as "Shiloh") *with* Leanne Taylor Decl. (spelling the dog's name as "Shilo").)  The court adopts the spelling "Shilo," as that is the spelling used in the complaint.  (*See* Am. Compl. ¶ 5.)

[3] "[U]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the [c]ourt."  *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (citations omitted).

[4] Portions of Officer Coleman's deposition are also in the record as Exhibit A to Mr. Karp's declaration.  (*See* 1st Karp Decl., Ex. A.)  The court cites to Officer Coleman's deposition as "Coleman Dep." wherever it appears in the record.

home inspection to determine whether the home would be a suitable placement for Mr. Rodarte.  (*See* Coleman Dep. at 65:9-18, 82:10-20.)

In the weeks prior to November 30, 2017, Ms. Taylor spoke to a DOC officer who she believes was named "David" over the phone about the ORP inspection.  (*See* Leanne Taylor Decl. ¶ 3.)  Ms. Taylor testifies that the officer she spoke with informed her of the home inspection requirement but told her that information would be mailed to her home and then the DOC would contact her again to schedule the inspection.  (*See id.* ¶¶ 2-3, 5.)  During that call, Ms. Taylor informed the officer that she had a "blue-nosed pit" in her home that was "quite gentle."  (*See id.* ¶ 4.)  Records from the DOC are consistent with this portion of Ms. Taylor's recollection.  (*See id.* at p.6 (DOC ORP report indicating that Ms. Taylor "advised that she has a male 'blue nose pit' that is very friendly" in her home).[5])  Ms. Taylor testifies that the officer suggested that Ms. Taylor should have her dog in another room or out of her home during the inspection, but that she would have time to arrange for that because the inspection would be set in advance.  (*See id.* ¶ 5.)  Ms. Taylor received a letter about the upcoming inspection, but no one from the DOC contacted her to schedule an inspection.  (*See id.* ¶ 6.)

---

[5] Affidavits or declarations filed in support of or opposition to summary judgment motions "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  The ORP report attached to Ms. Taylor's declaration is not properly authenticated.  (*See, e.g.*, Leanne Taylor Decl. ¶ 4 (stating that the attached ORP report "is the [ORP] plan for my son with written comments from a DOC Counselor" without laying foundation for Ms. Taylor's personal knowledge of the ORP report or authenticating the report as a true and accurate copy).)  However, Mr. Goon cured this deficiency by filing a supplemental declaration from his counsel, Mr. Karp, that indicated that the document attached to Ms. Taylor's deposition is a true and correct copy of the ORP report produced by Defendants in their initial disclosures.  (*See* 2d Karp Decl. at 1.)  Thus, the court will consider that document.

1    Officer Coleman and another DOC officer, Angel Davis, first attempted to

2    conduct an ORP inspection at Ms. Taylor's residence on November 16, 2017.  (*See*

3    Coleman Dep. at 63:6-65:11; *see also* Leanne Taylor Decl. ¶ 8.)  Officer Coleman did not

4    call ahead to schedule an appointment with Ms. Taylor.  (*See* Leanne Taylor Decl. ¶ 6;

5    Coleman Dep. 81:5-10.)  According to Officer Coleman, although he occasionally

6    schedules home visits in advance, it is standard practice to conduct a "random visit"

7    without calling ahead to ensure that the homeowner cannot stage the residence before the

8    inspection.  (*See* Coleman Dep. at 68:2-20, 77:15-78:19, 79:12-82:9.)  Officer Coleman

9    acknowledges that he knew Ms. Taylor had a dog at her residence prior to his November

10   16, 2017, visit because he had read the ORP file that indicated that Ms. Taylor had

11   informed the DOC that she had a dog at her home.[6]  (*See id.* at 88:12-89:9; *see also*

12   Leanne Taylor Decl. at p.6.)  When Officer Coleman approached the front door and

13   knocked, he heard a dog barking from inside Ms. Taylor's residence.  (*See* Coleman Dep.

14   at 85:21-24.)  Officer Coleman could not see the dog inside the home and could not recall

15   if the barking sounded aggressive or if the dog growled at him, but his impression was

16   that the dog inside the home was "not a small dog."  (*See id.* at 85:25-86:8.)  No one

17   answered the door when Officer Coleman knocked, so Officer Coleman left his business

18   card behind and left.  (*See* Coleman Dep. at 64:3-7, 74:23-77:4, 86:9-24; Leanne Taylor

19   Decl. ¶ 8.)

20

21        [6] Although the ORP file that Officer Coleman referred to states that there was a "blue
     nose pit" at Ms. Taylor's home, Officer Coleman testifies only that he knew there was a dog at
     the residence.  (*See id.* at 88:12-89:9; *see also* Leanne Taylor Decl. at p.6.)  He cannot recall
22   specifically if he knew the dog was a "blue nose pit."  (*See* Coleman Dep. at 88:12-89:9.)

On November 30, 2017, the day of the shooting, Officer Coleman returned to Ms. Taylor's residence to make another attempt to conduct the ORP inspection with a different DOC officer, Holden Wilkinson. (*See* Am. Compl. ¶¶ 11-12; Answer ¶ 12; Coleman Dep. at 82:10-20.) The officers did not schedule the November 30, 2017, ORP inspection in advance (*see* Leanne Taylor Decl. ¶ 7), and Officer Coleman had not received a call from Ms. Taylor since he left his business card on November 16, 2017, (*see* Coleman Dep. at 90:11-17). Surveillance video footage from Ms. Taylor's residence shows that Officers Coleman and Wilkinson's vehicle arrived in Ms. Taylor's driveway at 10:51:35 a.m. and the officers had exited the vehicle and reached Ms. Taylor's front gate by 10:52:24 a.m. (*See* Clay Decl. ¶ 8, Ex. F ("Surveillance Video") at 10:51:35-10:52:24.) When Officer Coleman approached the gate, he had a firearm, OC spray, handcuffs, and a medical packet on his toolbelt at the time of his visit, but no TASER.[7] (*See* Coleman Dep. at 91:2-13.) Officer Wilkinson carried a TASER, handcuffs, a firearm, a flashlight, OC spray, and a medical kit. (*See* 1st Karp Decl., Ex. D ("Wilkinson Dep."[8]) at 105:20-107:2.)

When Officers Coleman and Wilkinson arrived at the front gate, the officers stayed behind the gate and Officer Coleman whistled and made other noises "to see if there [were] any animals on the scene" or whether "any animals [would] come up to the

---

[7] "OC spray" refers to Oelorosin Capsicum spray, which is commonly known as pepper spray. (*See* MSJ Resp. at 8; 1st Crosby Decl., Ex. E at 95.)

[8] Portions of Officer Wilkinson's deposition are also in the record as Exhibit E to Mr. Clay's declaration. (*See* Clay Decl. ¶ 7, Ex. E.) The court cites to Officer Wilkinson's deposition as "Wilkinson Dep." wherever it appears in the record.

gate." (*See id.* at 99:4-16; Wilkinson Dep. at 72:16-21.[9]) When no animal came to the

gate, the officers then entered through the gate at 10:52:29 a.m. and proceeded to the

front door (*See* Surveillance Video at 10:52-24-10:52:35 a.m.) Officer Wilkinson closed

the front gate behind him at 10:52:35 a.m. (*See* Surveillance Video at 10:52-24-10:52:35

a.m.) Because the surveillance footage is fixed on the front gate area and does not show

the front door of Ms. Taylor's home, Officers Coleman and Wilkinson are out of view of

the surveillance camera for 21 seconds—from 10:52:38 to 10:52:59 a.m. (*See*

Surveillance Video at 10:52:38 to 10:52:59 a.m.)

Photographs of Ms. Taylor's home show that the front door is located inside a

"very narrow" covered outdoor hallway or deck at the top of three stairs. (*See* 1st Crosby

Decl. at 107-108, 111; 1st Karp Decl., Ex. C ("Robbert Taylor Dep."[10]) at 18:5-7.)

Roughly 10 feet to the right of the front door—from the perspective of someone facing

the front door from the outdoor hallway—is a separate sliding glass door entrance to Ms.

Taylor's home. (*See* Robbert Taylor Dep. at 26:17-27:9; 1st Crosby Decl. at 108.[11])

There is approximately 25-30 feet between the sliding glass door and the front gate that

//

---

[9] Although the surveillance footage from Ms. Taylor's home does not include audio, the footage shows that Officers Coleman and Wilkinson paused at the front gate for a few seconds and looked around before opening the gate. (*See* Surveillance Video at 10:52:24-10:52:29 a.m.)

[10] Portions of Mr. Taylor's deposition are also in the record as Exhibit B to Mr. Clay's declaration. (*See* Clay Decl., ¶ 4, Ex. B.) The court cites to Mr. Taylor's deposition as "Robbert Taylor Dep." wherever it appears in the record.

[11] Because the documents attached to Mr. Crosby's declaration are not demarcated with authenticating paragraph numbers or exhibit cover sheets, the court cites the page number supplied by its electronic docketing system.

the officers walked through, which means that the front door is about 15-20 feet from the front gate.  (*See* Robbert Taylor Dep. at 27:4-14; 1st Crosby Decl. at 107, 111.)

The officers testify that they approached the front door and knocked to see if anyone was home.  (*See* Coleman Dep. at 99:19-100:3; Wilkinson Dep. at 72:22-73:1.) After knocking, they heard a dog barking "right there at the [front] door" inside Ms. Taylor's home.  (*See* Coleman Dep. at 99:19-100:15, 103:1-3; Wilkinson Dep. at 72:22-73:1, 86:11-87:13.)  Once the dog began barking, Officer Wilkinson closed the outward-opening screen door and either one or both of the officers placed their hands and feet up against the screen door to prevent the dog from running out the inward-opening front door in the event that someone opened the front door.[12]  (*See* Coleman Dep. at 100:7-18; Wilkinson Dep. at 72:22-73:7, 88:6-12, 89:2-6.)  Officer Wilkinson testifies that one of the officers called inside the home for anyone inside to "secure your dog," but Officer Coleman does not recall that they had the opportunity to say anything at the front door.  (*See* Wilkinson Dep. at 73:8-13, 89:12-90:1; Coleman Dep. at 106:7-12.) Eventually, the barking grew quieter, which suggested to Officer Coleman that someone was home and securing the dog.  (*See* Coleman Dep. at 103:1-5, 106:7-107-4.) Regardless, the officers stayed at the front door to make sure it remained secured.  (*See* Coleman Dep. at 103:1-5, 107:5-23; Wilkinson Dep. at 86:11-87:13, 89:2-6.)

---

[12] Officer Coleman testifies that he believed both he and Officer Wilkinson were at the front door and that they "put both our hands and our feet up against the door."  (*See* Coleman Dep. at 100:7-18.)  Officer Wilkinson is certain that he held the door with his hand and foot, but testifies that he cannot recall what Officer Coleman did at the time because that was not something he focused on.  (*See* Wilkinson Dep. at 85:17-23, 87:14-89:6.)

Unbeknownst to the officers at the time they approached Ms. Taylor's front door, Robbert Taylor, Ms. Taylor's brother, was at Ms. Taylor's home. (*See* Robbert Taylor Dep. at 14:14-22.) Mr. Taylor was asleep in the living room when Shilo woke him up by "pacing back and forth [and] barking." (*See id.* at 14:19-25.) Mr. Taylor got up, looked out a window, and saw a car in the parking space outside Ms. Taylor's front gate. (*See id.* at 15:1-6.) Mr. Taylor realized that someone was outside, so he walked over to the sliding glass door, opened it, and "poked [his] head out" to see who was there. (*See id.* at 15:4-11.) Mr. Taylor says that he saw Officer Wilkinson standing at the top of the steps next to the front door with his back to the sliding glass door, while Officer Coleman stood about 10 to 15 feet behind Officer Wilkinson. (*See id.* at 15:7-11, 18:24-19:22, 21:14-21.) Officer Wilkinson agrees that he stood near the front door with the sliding glass door either behind him or to his side when Mr. Taylor opened the sliding glass door. (*See* Wilkinson Dep. at 90:10-23, 96:25-97:10.) Officer Coleman's deposition testimony does not clearly indicate where he stood when Mr. Taylor opened the sliding glass door, but he does recall that he was at or near the front door with Officer Wilkinson when the officers first heard the dog barking inside Ms. Taylor's home. (*See* Coleman Dep. at 100:7-18.)

When Mr. Taylor opened the sliding glass door, Shilo exited out that door either at the same time or shortly after Mr. Taylor stepped onto the porch. (*See* Robbert Taylor Dep. at 15:7-16, 16:24-17:6, 18:2-4, 31:25-32:3; Coleman Dep. at 103:1-8; Wilkinson Dep. at 90:24-25.) The three eyewitnesses agree that Shilo ran quickly out the door and

//

toward the officers who stood nearby.  First, Officer Wilkinson testifies that he believed

Shilo ran directly at him when he exited the door:

> **Q.  Okay.  What was Shiloh doing the moment you saw him?**
> A.  Pushing past the owner, running at me.
> **Q.  Directly at you?**
> A.  Yes.
> **Q.  And what was h[is] behavior, his gait, his demeanor --**
> A.  Barking --
> **Q.  -- as he was approaching you?**
> A.  -- running very fast towards me.
> **Q.  Anything else you recall?**
> A.  Just it was so quick.  I mean, I would guess it was under a half second that it took for the dog to be from the doorway to me; so I don't recollect almost anything.  I saw the dog running out, coming directly at me, and that's it.

(Wilkinson Dep. at 90:24-91:11.)  Officer Coleman testifies that Shilo "bolt[ed] out" of

the door and ran in his direction:

> **Q.  And then what happened?**
> A.  Then we heard the dog, and all of a sudden the dog's right there at the door.  It gets, like, it's going backwards.  So now we're under the impression someone's home; so we're going to stay right here, make sure the door is secured.  That's when I believe the patio door opens up.  The dog bolts out the door barking, running towards me, runs down the stairs.
>
> *        *        *
>
> **Q.  Okay.  So you saw Shiloh.  When you first saw Shiloh, what was Shiloh doing specifically?  What do you remember him doing?**
> A.  Running towards me.
> **Q.  Was he focused on you?**
> A.  Yes.

(Coleman Dep. at 103:1-8; 108:21:109:1.)

Finally, Mr. Taylor agrees that Shilo ran out of the door and "up to" the officers:

> A.  So I came out onto the porch fully, opened it, poked my head out and came out.  At the same time, Shilo came out.  Shilo ran up to the first guy to

greet him, and then just as he was going for the other guy -- I thought it was firecrackers.

(Robbert Taylor Dep. at 15:12-16.)  Mr. Taylor testifies that Shilo ran at Officers Wilkinson and Coleman to "greet" them or play with them, which was his typical practice.[13]  (*See* Robbert Taylor Dep. at 15:12-16 ("Shilo ran up to the first guy to greet him"), 20:12-21:2 ("Shilo always comes out and just greets – he wants to play.  He thinks it's playtime.  And that's all he was doing."), 21:24-22:6 ("What Shilo usually does is he goes out for his ball.  He wants to play fetch or something.  Tug of war or whatnot.  And I believe that's what he was going for.").)  According to Officer Wilkinson, Mr. Taylor did not say anything to Shilo or to the officers about Shilo after he opened the sliding glass door.  (*See* Wilkinson Dep. at 97:11-24.)

Officers Wilkinson and Coleman perceived Shilo's intent much differently than Mr. Taylor did.  Both officers believed that Shilo was a threat to their safety.  (*See* Coleman Dep. at 122:22-123:2 ("At the time I believed I was going to get hurt. . . . I thought I was going to get bit, possibly die."), 128:7-13 (Q. "In the moment when you first saw Shilo emerge from the slider, you had to have thought to yourself, 'I need to select a weapon.'  Right?  Didn't you think that?"  A. "I thought I need to save myself and my partner.  That's what I was thinking."  Q. "From what?"  A. "Great bodily harm or death.  That's what I believed."); Wilkinson Dep. at 92:25-93:7 (Q. "And so when

---

[13] Mr. Goon, Ms. Taylor, and the owner of the animal shelter that Mr. Goon adopted Shilo from all submitted declarations that attest that Shilo was a friendly, well-socialized dog with no history of violence.  (*See* Goon Decl. ¶¶ 6-14; Leanne Taylor Decl. ¶ 4; Thomas Decl. ¶¶ 2-3.)

Shilo is coming down the corridor toward you, did you arm a weapon? Did you step aside? Did you push him away? What did you –" A. "I believed the dog was attacking; so I turned to the side. I believed it was coming at me. I was hoping that it would bite me on my arm or my hand; so I put that arm out to prevent damage to anything more important and drew my TASER and pointed it at the animal."); Wilkinson Dep. at 95:1-15 (stating that once Shilo passed him, Officer Wilkinson saw that Shilo was attacking Officer Coleman).)

When Shilo first exited the sliding glass door, he ran at Officer Wilkinson (*see* Robbert Taylor Dep. at 20:12-16; Wilkinson Dep. at 90:20-91:11), who Mr. Taylor testifies stood about 10 to 15 feet closer to the sliding glass door than Officer Coleman (*see* Robbert Taylor Dep. at 18:24-19:22, 21:14-21). Officer Wilkinson recalls that Shilo barked as he ran out, but Officer Wilkinson could not recall whether Shilo made any other sounds or showed other signs of aggression at that time. (*See* Wilkinson Dep. at 91:3-92:12.) Although Mr. Taylor agrees that Shilo ran out of the door and at Officer Wilkinson, he testifies that Shilo did not bark after he ran out of the residence. (Robbert Taylor Dep. at 18:16-23.) As soon as Officer Wilkinson saw Shilo, he testifies that he turned to the side, put one arm out in hopes that Shilo would bite his arm or hand, and drew his TASER and pointed it at Shilo. (*See* Wilkinson Dep. at 92:13-93:7.) After Officer Wilkinson put his arm out, Officer Wilkinson claims that Shilo kept running at him, but did not stop to touch him or sniff him in any way. (*See id.* at 93:15-22.) Mr. Taylor's testimony conflicts with portions of Officer Wilkinson's account. Mr. Taylor claims that, when Officer Wilkinson stuck out his hand, Shilo went up to greet or sniff

Officer Wilkinson, slowed down, briefly stopped, and "almost [went] down to a sit." (*See* Robbert Taylor Dep. at 20:12-21:13, 25:23-26:7.)  Both Mr. Taylor and Officer Wilkinson agree that this sequence of events unfolded in a matter of seconds, at most. (*See* Robbert Taylor Dep. at 21:3-22:5, 25:23-26:12; Wilkinson Dep. at 90:20-91:11 (estimating that it took Shilo "under a half second" to reach Officer Wilkinson from the sliding glass door).)

After Shilo moved past Officer Wilkinson, he ran at Officer Coleman.  (*See* Wilkinson Dep. at 94:13-95:15, 96:17-19; Robbert Taylor Dep. at 20:12-16, 21:3-21.) Officer Coleman testifies that he fled down the stairs toward the gate and yelled "[s]ecure your dog" as soon as he saw Shilo come out the door.  (*See* Coleman Dep. at 103:1-13, 105:1-22, 106:7-12 108:21-109:4, 112:10-18.)  He claims that he wanted to "get[] distance" on Shilo so he could "see what was going on."  (*See id.* at 103:1-13, 108:21-109:4.)  While he tried to get away from Shilo, Officer Coleman believes that he was looking at Shilo at a tilt or an angle.  (*See id.* at 111:12-23.)  Officer Coleman recalls Shilo barked while he ran at him, but Officer Coleman could not remember whether Shilo made any other sounds or engaged in aggressive behaviors because his focus was on trying to distance himself from Shilo.  (*See id.* at 108:21-110:10.)

Mr. Taylor claims that he had difficulty seeing Officer Coleman from his vantage point due to Officer Coleman's position behind Officer Wilkinson, but Mr. Taylor thought he saw Officer Coleman fall down or stumble briefly as he fled from Shilo.  (*See* Robbert Taylor Dep. at 19:23-20:11, 23:6-10.)  Mr. Taylor did not hear Officer Coleman yell anything as Shilo approached Officer Coleman.  (*See id.* at 22:11-17.)  Officer

Wilkinson claims that he looked briefly toward Mr. Taylor after Shilo ran past him before turning his focus back to Shilo and Officer Coleman. (*See* Wilkinson Dep. at 96:25-97:12.) Officer Wilkinson testifies that it looked like Shilo was "running at [Officer Coleman] and moving in an aggressive manner towards him." (*See id.* at 95:3-23.)

The eyewitnesses agree that Officer Coleman fired two shots at Shilo. (*See* Coleman Dep. at 103:1-15; Wilkinson Dep. at 96:13-15; Robbert Taylor Dep. at 15:12-20, 23:6-13.) The surveillance video captures the second shot, but not the first. (*See* Surveillance Video at 10:52:38-10:53:02 a.m.) Although Officer Coleman does not remember exactly where he was when he fired the first shot at Shilo, he testifies that he believes he was close to the front gate but had not yet made contact with the gate.[14] (*See* Coleman Dep. at 110:24-112:18.) Officer Coleman also cannot recall what direction his body faced when he fired at Shilo or what angle he pointed his firearm at when he shot at Shilo, but he claims that Shilo was in the "walkway" when he fired the first shot at him. (*See id.* at 114:6-116:10.) Officer Coleman estimates that Shilo was "real close" to him—perhaps only "[a] couple feet away"—when he fired the first shot, which is consistent with Officer Wilkinson's testimony. (*See id.* at 117:3-7, 117:12-16; Wilkinson Dep. at 101:3-12.) Mr. Taylor claims that Shilo was still on the stairs in the covered walkway, roughly 15 feet from Officer Coleman, when Officer Coleman fired his first shot. (*See* Robbert Taylor Dep. at 25:13-26:16.) Officer Coleman believes that he hit

---

[14] Officer Coleman's testimony about his location when he fired the first shot is consistent with Officer Wilkinson's recollection and the surveillance footage—which would have captured both of Officer Coleman's shots had they both been fired from the front gate. (*See* Wilkinson Dep. at 98:7-12; Surveillance Video at 10:52:38-10:53:02 a.m.)

Shilo with the first shot, and both Officer Wilkinson and Mr. Taylor recall that Shilo yelped after the first shot rang out. (*See* Coleman Dep. at 119:13-20; Wilkinson Dep. at 99:5-13; Robbert Taylor Dep. at 15:12-20, 27:23-26:16, 33:8-12.)

The surveillance footage shows that Officer Coleman fired the second shot at Shilo at 10:53:01 a.m.—no more than 30 seconds after Officers Coleman and Wilkinson walked through the front gate. (*See* Surveillance Video at 10:52:31-10:53:01 a.m.) As shown on the video footage, Officer Coleman stumbled backward toward the front gate at 10:53:00 a.m. with a clipboard in his left hand and a firearm in his right hand. (*See id.* at 10:52:59-10:53:03 a.m.) Officer Coleman then collided with the fence less than a second later at 10:53:00 a.m., dropped his clipboard, gathered himself briefly, and fired a second shot at 10:53:01 a.m. (*See id.*) Shilo was not within the area captured by the video footage when Officer Coleman fired, but he ran into the frame after Officer Coleman fired—less than a second later. (*See id.*) Mr. Taylor testifies that, after the first shot, he believes Shilo was running at Officer Coleman to try to "make the corner" of the home and get away. (*See* Robbert Taylor Dep. at 24:21-25:6, 29:13-30:12.) The "corner" of Ms. Taylor's home that Mr. Taylor refers to was only five feet from Officer Coleman at the time Officer Coleman fired the second shot. (*See id.* at 28:8-16.) Thus, the video and testimony suggest that Shilo was still running at Officer Coleman and no more than five feet away from him when Officer Coleman fired the second shot. (*See* Surveillance Video at 10:52:59-10:53:03 a.m.; Wilkinson Dep. at 101:6-12; Coleman Dep. at 117:3-16; Robbert Taylor Dep. at 28:8-16.) After Officer Coleman fired the second shot, Shilo

//

peeled off to Officer Coleman's left and ran out of the frame, where he ultimately died. (*See* Surveillance Video at 10:52:59-10:53:03 a.m.; Robbert Taylor Dep. at 35:3-16.)

Officer Coleman testifies that he fired the second shot at Shilo—instead of using OC spray—because he still feared for his life and believed Shilo was still coming at him. (*See* Coleman Dep. at 119:19-121:1, 122:22-123:2, 128:7-13.) Officer Coleman claims that Shilo continued barking after the first shot, but he cannot recall whether Shilo made any other aggressive behaviors or sounds. (*See id.* at 122:1-21.) Although Officer Coleman cannot remember how much time elapsed between the two shots, Mr. Taylor testifies that only one to three seconds elapsed between the shots, and Officer Wilkinson estimates that only "a couple seconds" elapsed between the shots. (*See id.* at 118:9-20; Robbert Taylor Dep. at 23:6-24:15; Wilkinson Dep. at 98:13-19.) Mr. Taylor testifies that the entire sequence, from the time that Mr. Taylor poked his head out of the sliding glass door to the end of the second shot, took "maybe five or six seconds." (*See* Robbert Taylor Dep. at 34:7-12.) After Officer Coleman fired the shots, the officers exited out the front gate and waited for other law enforcement to arrive. (*See* Surveillance Video at 10:53:00-11:00:00; Robbert Taylor Decl. at 35:22-39:9.)

The parties agree that Officer Coleman caused Shilo's death. (Am. Compl. ¶ 18; Answer ¶ 18; *see also* Necropsy Rpt. at 10.) Dr. Jennifer G. Ward conducted a necropsy on Shilo after the shooting and concluded that Shilo had been hit by two gunshots. (*See* Necropsy Rpt. at 9-10.) The entry wound for the non-fatal shot was on Shilo's right caudal tarsus, with an exit wound on the craniomedial tarsus. (*See id.*) Dr. Ward concluded that the path of the projectile was "back to front, right to left (approximately

43 degrees), and downward (approximately 8 degrees)." (*See id.*) The fatal shot entered Shilo through the left thorax and did not leave an exit wound. (*See id.* at 9-12.) The path of that projectile was "front to back, left to right (approximately 37 degrees), and downward (approximately 11 degrees)." (*See id.* at 9.) The parties agree that this fatal shot was the second shot that Officer Coleman fired. (*See* MSJ at 4; MSJ Resp. at 3.)

### III.    ANALYSIS

Mr. Goon filed one federal cause of action against Officer Coleman for constitutional violations under 42 U.S.C. § 1983 and four state law causes of action against Officer Coleman, the State, and the DOC for conversion, property damage, statutory or common law nuisance, and negligence. (*See* Am. Compl. ¶¶ 49-53.) Defendants move for summary judgment on all of Mr. Goon's causes of action. (*See* MSJ at 1.) Defendants argue that Officer Coleman is entitled to qualified immunity against Mr. Goon's Section 1983 claim (*see id.* at 6-11), and they argue that they are entitled to summary judgment on each of the state law claims for independent reasons (*see id.* at 11-16). Mr. Goon argues that summary judgment is not warranted on his federal or state claims (*see* MSJ Resp.), and separately moves to exclude portions of the testimony of the Defendants' proposed canine expert, Mr. Berman (*see generally* MTE). The court first addresses Defendants' summary judgment motion before turning to the motion to exclude Mr. Berman.

//

//

//

**A.      Defendant's Motion for Summary Judgment**

    1.      <u>Summary Judgment Standard</u>

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge."

*Liberty Lobby*, 477 U.S. at 249-50.  Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).  Nor can a party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

2.    <u>Qualified Immunity Standard</u>

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018).  In determining whether a government employee is entitled to qualified immunity, the court must decide: (1) whether the facts that the plaintiff alleges assert a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time the defendant engaged in the misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Courts have discretion to decide which of the two prongs of this test to address first. *See id* at 236; *Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011).  Where a "genuine issue of material fact exists that prevents a

//

determination of qualified immunity at summary judgment, the case must proceed to trial." *Bonivert v. Clarkson*, 883 F.3d 865, 871-72 (9th Cir. 2017).

For a constitutional right to be clearly established, a court must define the right at issue with "specificity" and "not . . . 'at a high level of generality.'" *City of Escondido, Cal. v. Emmons*, --- U.S. ---, 139 S. Ct. 500, 503 (2019) (quoting *Kisela*, 138 S. Ct. at 1152). The plaintiff "bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted). "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate." *Emmons*, 139 S. Ct. at 504 (quoting *Dist. of Columbia v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 581 (2018) (internal quotation marks omitted)); *see Jessop v. City of Fresno*, 936 F.3d 937, 940-41 (9th Cir. 2019) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). When the only cases a plaintiff cites are factually distinguishable, or provide "nothing more than a general principle," the public official is entitled to qualified immunity "except in the 'rare obvious case' in which a general legal principle makes the unlawfulness of the [official's] conduct clear despite a lack of precedent addressing similar circumstances." *West v. City of Caldwell*, 931 F.3d 978, 983, 985 (9th Cir. 2019) (quoting *Emmons*, 139 S. Ct. at 503-04).

//

//

3. <u>Mr. Goon's 42 U.S.C. § 1983 Claim</u>

Mr. Goon's claim under 42 U.S.C. § 1983 is based on Officer Coleman's killing of Shilo, which is a seizure under the Fourth Amendment. (*See* Compl. ¶ 49; MSJ Resp. at 14-17); *see also San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) ("'The killing of [a] dog is a destruction recognized as a seizure under the Fourth Amendment' and can constitute a cognizable claim under § 1983." (quoting *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds, Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir.2002))).  It is well-established that "[r]easonableness is the touchstone of any seizure under the Fourth Amendment." *Id.*  Thus, for purposes of the first prong of the qualified immunity analysis on Mr. Goon's § 1983 claim, the question is whether the shooting of Shilo was "reasonable under the circumstances," *see id.*, while the key question for the second prong is whether it was clearly established at the time of the shooting that Officer Coleman's conduct constituted an unreasonable Fourth Amendment seizure, *see id.* at 977.

The court first considers the clearly established prong of the qualified immunity analysis. *See Pearson*, 555 U.S. at 236; *Chism*, 661 F.3d at 386.  Because the clearly established analysis focuses on "settled law," the right at issue "must be clearly established by controlling authority or a robust consensus of cases of persuasive authority."  *Tuuamalemalo v. Greene*, --- F.3d ---, No. 18-15665, 2019 WL 7161278, at *3 (9th Cir. Dec. 24, 2019) (citing *Wesby*, --- U.S. ---, 138 S. Ct. at 590-91 (2018).  The court and the parties have identified six relevant Ninth Circuit opinions, a handful of

out-of-circuit appellate court opinions, and a number of district court opinions that speak

to the issue presented here—law enforcement use of force on dogs.[15]  The court first

assesses whether there is any clearly established law under controlling Ninth Circuit

authority before turning to the question of whether there is a "robust consensus of cases

of persuasive authority" outside of the Ninth Circuit.  *See id.*

First, in *Fuller v. Vines*, the plaintiffs alleged that their pet dog "stood up" when

law enforcement officers passed by the plaintiffs' yard, but the law enforcement officers

alleged that the dog charged at them while barking and growling.  36 F.3d at 66.

Although one of the plaintiffs "pleaded with the officers not to shoot his dog and told

them he could control [the dog]," the officers shot the dog twice, which killed him.  *See*

*id.* at 66.  The plaintiffs initially pleaded a due process claim, but sought leave to amend

to add a claim that the killing of their dog was an unlawful seizure under the Fourth

Amendment.  *See id.* at 67-68.  The *Ninth* Circuit held that the trial court erred in failing

to grant leave to amend because "[t]he killing of a dog is a destruction recognized as a

seizure under the Forth Amendment."  *See id.* at 68.

Second, in *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*,

law enforcement officers shot and killed three different dogs at two different properties

while executing high-risk search warrants at residences of members of the Hells Angels.

*See* 402 F.3d at 965.  The Ninth Circuit specifically noted that, although law enforcement

had a week of advanced notice of the presence of aggressive dogs on properties that they

---

[15] The parties did not identify any relevant Washington decisions (*see generally* MSJ; MSJ Resp.; MSJ Reply) and the court has not identified any.

intended to enter and search without the owners' knowledge or permission, "the officers

developed no realistic plan other than shooting the dogs while serving the search

warrants." *See id.* at 976.  Although the Ninth Circuit stated that "the governmental

interest of safety might have provided a sound justification for the intrusion had the

officers been surprised by the presence of the dogs," the court ultimately found that the

officers' failure to create a non-lethal plan to control the dogs left them "without any

option but to kill the dogs in the event they—quite predictably—attempted to guard the

home from invasion." *See id.* at 977.  Thus, the court held that the search was

unreasonable under the Fourth Amendment, and then concluded that it was clearly

established that "that the Fourth Amendment forbids the killing of a person's dog . . .

when that destruction is unnecessary—i.e., when less intrusive, or less destructive,

alternatives exist." *See id.* at 977-78.  More specifically, the court concluded that—in the

context of the execution of a high-risk search warrant—"[a] reasonable officer should

have known that to create a plan to enter the perimeter of a person's property, knowing

all the while about the presence of dogs on the property, without considering a method

for subduing the dogs besides killing them, would violate the Fourth Amendment." *See

id.* at 978.

Third, in *Criscuolo v. Grant County*, the Ninth Circuit reversed a trial court's grant

of summary judgment in favor of a law enforcement officer who shot a dog who may

have been attacking the officer's police dog.  *See* 540 F. App'x 562, 563 (9th Cir. 2013).

The Ninth Circuit noted that the facts taken in the light most favorable to the plaintiff

showed (1) the dog "was not springing toward [the officer's police dog]," (2) the dog

"was either stationary or retreating at a distance of 10-20 feet from [the officer and his police dog]," and (3) the owner was "one to two feet away and about to leash [the dog]." *See id.* The district court opinion elaborated that the plaintiff testified that the officer kicked his dog three times while the plaintiff's dog was attacking the officer's dog, and the third kick sent the dog retreating to the plaintiff. *See Criscuolo v. Grant Cty.*, No. CV-10-470-LRS, 2012 WL 1200563, at *5-6 (E.D. Wash. Apr. 9, 2012). During the retreat, the officer shot the plaintiff's dog. *See id.*

In light of these factual inferences, the Ninth Circuit concluded that the dog that was killed "posed no imminent threat" to the officer's police dog, such that the officer "did not need to make any-split second decision" to protect his dog. *See* 540 F. App'x at 563 (citations omitted). Further, the court cited *Hells Angels*, and noted that it was clearly established that "the Fourth Amendment forbids the killing of a person's dog . . . when that destruction is unnecessary—i.e., when less intrusive, or less destructive, alternatives exist." *See id.* at 564. The court found that this case did not fall "within the hazy spectrum between unreasonable and reasonable seizures" because the dog was retreating when it was shot and killed and the dog's owner was trying to regain control of the dog. *See id.* Finally, the court concluded that it was "clearly established that it is unreasonable to shoot an unleashed dog—even if it surprises an officer on public property—if it poses no imminent or obvious threat, its owner is in close proximity and desirous of obtaining custody, and deadly force is avoidable." *See id.* (citations omitted).

Fourth, *Thurston v. City of North Las Vegas Police Department*, like *Hells Angels*, dealt with the shooting of dogs during the execution of a high-risk search warrant. *See*

552 F. App'x 640, 641-42 (9th Cir. 2014).  In *Thurston*, the court concluded that the search was unreasonable because (1) the police waited 20 minutes after entering the home before firing on the dogs on the property without any explanation as to why the officers failed to summon animal control before the shooting occurred; (2) there was a genuine dispute of fact as to whether the dogs attacked the officers due to the owner's testimony that the dogs were behaving pleasantly before the attack; and (3) one of the officers testified that department policy dictated attendance and participation of animal control when police know that an animal is inside a home.  *See id.* at 642.  The court also held that the officers' seizure violated the clearly established law articulated in *Hells Angels* that "a reasonable officer 'should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method of subduing the dogs besides killing them, would violate the Fourth Amendment.'"  *See id.* at 643 (quoting *Hells Angels*, 402 F.3d at 978).

Fifth, in *Wickersham v. Washington*, the Ninth Circuit summarily affirmed the trial court's finding that a law enforcement officer was entitled to qualified immunity where the officer shot a dog that "lunged at" the officer.  694 F. App'x 559, 560 (9th Cir. 2017).  The court also concluded that there was no clearly established law indicating that the officer's behavior ran afoul of the Fourth Amendment.  *See id.*  The district court opinion that the Ninth Circuit affirmed sheds light on the facts of the shooting.  *See Wickersham v. Washington*, No. C13-01778JCC, 2015 WL 224810 (W.D. Wash. Jan. 15, 2015).  In that case, an officer with the Washington Department of Fish and Wildlife spotted a woman fishing off a dock and drove around to the driveway associated with the dock to

check the woman's license.  *See id.* at *1.  When the officer failed to find the woman on

the dock, she went to the house nearby to try to locate the woman who she had seen

fishing.  *See id.*  At the house, she walked up to the home after she heard yelling and

announced her presence multiple times before someone inside the house responded.  *See*

*id.* at *2.  Seconds later, a 70-80 pound Doberman appeared and ran down the stairs at the

officer.  *See id.*  The dog had a shock collar on and bore its teeth at the officer, who

yelled to the dog's owner to secure the dog.  *See id.*  But the dog approached her and was

within a few feet of the officer within two or three seconds, so the officer fired two

rounds at the dog because she felt it was going to attack her.  *See id.*  On these facts, the

Ninth Circuit concluded that the seizure was reasonable and that there was no clearly

established law holding that the officer's conduct violated the Fourth Amendment.  *See*

*Wickersham*, 694 F. App'x at 560.

 Finally, in *Patino v. Las Vegas Metro. Police Department*, the Ninth Circuit held

that it was reasonable for an officer to use deadly force on charging, 120-pound pit bull

that charged at the officer in a back yard that the officer entered after hearing a gun shot

and moaning noises in the yard.  *See* 706 F. App'x 427 (9th Cir. 2017).  The court also

distinguished the emergency context the officer faced from the high-risk search warrant

entry in *Hells Angels* and concluded that no clearly established law prohibited the

officer's response to the emergency situation in this case.  *See id.*  As with *Wickersham*,

the trial court's decision in *Patino* is instructive.  *See Patino v. Las Vegas Metro. Police*

*Dep't*, 207 F. Supp. 3d 1158, 1164-66 (D. Nev. 2016).  The trial court found that the

search was reasonable after specifically noting that (1) the officer had roughly five

seconds to react to a 120 pound pit bull, (2) the dog was running at him aggressively, (3)

the other officer on scene also drew a weapon and perceived the dog to be a threat, (4) the

officer yelled at the dog to stop, and (5) the officer shot and killed the dog when it was

within two feet of him. *See id.* at 1164. The trial court also distinguished *Hells Angels*

based on the exigent circumstances faced in this case compared to the time that the

officers in *Hells Angels* had to plan for the dogs on the property. *See id.* at 1165-66. On

these facts, the Ninth Circuit affirmed and found that the seizure was reasonable and did

not violate any clearly established rights.[16] *See Patino*, 706 F. App'x at 427.

The controlling cases detailed above do not place the lawfulness of Officer

Coleman's conduct "beyond debate." *Emmons*, 139 S. Ct. at 504 (citations omitted). To

the contrary, the cases underscore that the controlling law on the use of force against dogs

in unexpected circumstances is unsettled and highly fact-specific. Although *Fuller* likely

established the rule in the Ninth Circuit that the killing of a dog is a seizure under the

Fourth Amendment, that case does not decide the question of whether Officer Coleman's

seizure was reasonable. *See Fuller*, 36 F.3d at 66-68. The owner of the dog in *Fuller*

testified that his dog merely "stood up" when the officers walked by and that he "pleaded

with the officers not to shoot his dog and told the officers he could control the dog." *See*

---

[16] Although the Ninth Circuit's opinion in *Patino* was not issued until December 15, 2017, *see* 706 F. App'x at 427, which was two weeks after Officer Coleman shot Shilo, the court's decision to affirm the trial court on the clearly established prong is still instructive on the state of clearly established law in the Ninth Circuit. The shooting in *Patino* occurred on January 6, 2013. *See* 207 F. Supp. 3d at 1161. The Ninth Circuit's conclusion that there was no clearly established law that prohibited the officer's shooting on that date is relevant to the state of the clearly established law during Officer Coleman's shooting on November 30, 2017.

*id.* at 66.  Here, although the parties dispute Shilo's intent in running at the officers, there is no dispute that he ran at them unexpectedly from a side door that was only 10 feet away from where the officers stood.  (Wilkinson Dep. at 90:24-91:11; Coleman Dep. at 103:1-8; Robbert Taylor Dep. at 15:12-16, 26:17-27:9.)  There is also no evidence that Mr. Taylor made an effort to try to control Shilo or speak to the officers about Shilo after Shilo exited the sliding glass door.  (*See* Wilkinson Dep. at 97:11-24.)  Thus, *Fuller* is too factually disparate to provide fair warning to Officer Coleman that his conduct was unlawful.

The central problem with *Hells Angels* is that it is not clear whether that case applies to the type of home inspection that Officer Coleman intended to conduct on November 30, 2017.  *Hells Angels* established the general standard "that the Fourth Amendment forbids the killing of a person's dog . . . when that destruction is unnecessary—i.e., when less intrusive, or less destructive, alternatives exist."  *See* 402 F.3d at 977-78.  The court further specified that "[a] reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment."  *See Hells Angels*, 402 F.3d at 978.  Although these rules articulate clearly established law in the context of law enforcement execution of search warrants, they are inapplicable to the facts of this case.  The officers in *Hells Angels* were planning to execute high-risk search warrants at 7:00 a.m. on properties that contained guard dogs.  *See id.* at 967-969.  The officers killed one dog while sweeping through the backyard of a home with guns drawn,

*see id.* at 968, and the officers killed two other dogs by shooting them through a fence in order to gain access to a yard, *see id.* at 969. Although Officer Coleman knew that there was a dog on Ms. Taylor's property, his plan to "enter" Mr. Taylor's property was to knock on the front door to see if anyone was home who could supervise his ORP inspection of the home, which is substantially different than the plan in *Hells Angels* to give brief "knock-notice" before forcefully entering and securing homes without the owners' consent. *See id.* at 967-69, 976-78. *Hells Angels* cannot be read so broadly as to clearly establish that an officer violates the Fourth Amendment by approaching and knocking on the front door of a home without a non-lethal plan to subdue animals that the officer knows are inside—even where the officer has no intention of entering the home without permission and supervision from someone inside.[17] *See, e.g.*, *Patino*, 706 F. App'x at 428 (finding that *Hells Angels* was inapplicable where officer "was not engaging in the calculated execution of a warrant").

*Thurston* is inapposite for the same reason as *Hells Angels*—Officer Coleman was not conducting a high-risk search warrant when he encountered Shilo. *See* 552 F. App'x 640. The officers in *Thurston* operated under a policy that required them to work with animal control, and the officers had 20 minutes after entering the home to summon

---

[17] Moreover, even if *Hells Angels* clearly established that Officer Coleman had to have a non-lethal plan to subdue Shilo, the court notes that the officers had a plan that was foiled by Shilo's unexpected exit from a side door. Officer Coleman whistled and made noises at the gate to draw out any animals in the yard (*see* Coleman Dep. at 99:4-16; Wilkinson Dep. at 72:16-21), and the officers braced the screen door with their hands and feet to prevent Shilo from exiting unexpectedly (*see* Coleman Dep. at 100:7-18; Wilkinson Dep. at 72:22-73:7, 88:6-12, 89:2-6). Mr. Goon has not cited any authority that clearly establishes that Officer Coleman was required to do more than that in the context of this type of entry onto Ms. Taylor's property.

animal control to assist with their search warrant. *See id.* at 641-42. Mr. Goon has not cited any evidence showing that Officer Coleman was required to contact animal control prior to visiting Ms. Taylor's residence (*see* 1st Karp Decl., Ex. B at 72-82), and, unlike the officers in *Thurston*, Officer Coleman had "maybe five or six seconds" to react to Shilo once Shilo unexpectedly ran out of the side door, (*see* Robbert Taylor Dep. at 34:7-12). *Thurston* builds on the contours of the controlling Fourth Amendment law identified in *Hells Angels* that requires officers to make non-lethal plans to control dogs when the officers anticipate that they may encounter dogs during the execution of high-risk search warrants that require that they enter and secure homes without the owners' consent. *See Hells Angels*, 402 F.3d at 978; *Thurston*, 552 F. App'x at 643 (citing *Hells Angels*). But that clearly established law does not speak to the reasonableness of Officer Coleman's reaction to Shilo's unexpected exit from a side door during an otherwise benign home visit.

The three remaining Ninth Circuit cases, *Criscuolo*, *Wickersham*, and *Patino*, are more useful because each of those cases deal with dog encounters that the officers could not anticipate. *See Criscuolo*, 540 F. App'x at 563-64; *Criscuolo*, 2012 WL 1200563 at *5-6; *Wickersham*, 694 F. App'x at 560; *Wickersham*, 2015 WL 224810 at *1-2; *Patino*, 706 F. App'x at 427; *Patino*, 207 F. Supp. 3d at 1164. The facts and holdings in these cases show that the contours of what is or is not reasonable in this context is far from clearly established. First, in *Criscuolo*, the Ninth Circuit noted that testimony suggested that when the officer shot and killed the dog, the dog was "stationary or retreating at a distance of 10-20 feet" and its owner was only "one to two feet away and about to leash

[the dog]." *See Criscuolo*, 540 F. App'x at 563. According to the plaintiff, the officer shot his dog after the dog retreated and tried to return to the plaintiff after the officer kicked his dog three times. *Criscuolo*, 2012 WL 1200563 at *5-6. Given those facts, the Ninth Circuit concluded that it was "clearly established that it is unreasonable to shoot an unleashed dog—even if it surprises an officer on public property—if it poses no imminent or obvious threat, its owner is in close proximity and desirous of obtaining custody, and deadly force is avoidable." *See id.*

There are significant factual differences between the shootings in this case and *Criscuolo*. When viewed in the light most favorable to Mr. Goon, a reasonable juror could conclude that the first shot Officer Coleman fired bore similarities to the fatal shots fired in *Criscuolo*. *See id.* Although none of the eyewitnesses testified that Shilo was moving away or retreating from Officer Coleman when Officer Coleman fired the first shot, the necropsy report concludes that that shot hit Shilo at a 43-degree angle in the back of the right leg—which is consistent with Mr. Goon's theory that Shilo was not facing Officer Coleman when Officer Coleman shot him the first time. (*See* MSJ Resp. at 11; Necropsy Rpt. at 9-10 (noting that the entry wound from the non-fatal shot was on Shilo's right caudal tarsus and that the path of the projectile was "back to front, right to left (approximately 43 degrees)".) Additionally, Mr. Goon claims Officer Coleman was about 15 feet away from Shilo when that shot was fired. (*See* Robbert Taylor Dep. at 25:13-26:16.) Even so, the eyewitness testimony, necropsy report, and surveillance video all show that Shilo ran directly at Officer Coleman and was no more than a few feet away from Officer Coleman when Officer Coleman fired the second shot that hit Shilo in the

left shoulder and ultimately killed him.[18]  (*See* Surveillance Video at 10:52:59-10:53:03

a.m.; Wilkinson Dep. at 95:3-23; Coleman Dep. at 119:19-121:1, 122:22-123:2, 128:7-

13; Necropsy Rpt. at 9-12.)  *Criscuolo* does not speak to the reasonableness of Officer

Coleman's conduct in firing the second shot—the one that ultimately killed Shilo and, as

such, constituted the seizure that Mr. Goon takes issue with (*see* MSJ Resp. at 17 ("[T]he

law has been long-settled (nearly 20 years in the 9th Circuit) that killing a dog

unnecessarily is a Fourth Amendment seizure.").[19]

The final two Ninth Circuit cases, *Wickersham* and *Patino*, muddy the water by

concluding that officers can be entitled to leeway when they encounter dogs under

---

[18] Mr. Goon's argument that Shilo was well-socialized and ran at Officer Coleman in order to get around the corner of the house to get to safety—which the court credits for purposes of summary judgment—is of no import.  The undisputed evidence shows that Shilo ran at Officer Coleman and was mere feet away from him at the time Officer Coleman shot him.  (*See* Surveillance Video at 10:52:59-10:53:03 a.m.; Wilkinson Dep. at 95:3-23; Coleman Dep. at 119:19-121:1, 122:22-123:2, 128:7-13; Necropsy Rpt. at 9-12.)  Even if Shilo had no intent to harm Officer Coleman in that moment, Officer Coleman could not have known Shilo's intent. *See Niesen v. Garcia*, No. 2:14-2921 WBS CKD, 2016 WL 4126382, at *10 (E.D. Cal. July 5, 2016) ("Unlike people, dogs can never state their 'intent' and, while an owner of a dog may develop such a bond that allows her to better predict what the animal might do based on its behavior, a dog's behavior can never be predicted with certainty and none of the Deputies were familiar with plaintiff's dogs so as to give them any insight into their tendencies.").

[19] Although the Ninth Circuit has held that if "an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law," *see Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), Mr. Goon does not argue that this doctrine applies to Officer Coleman's actions.  (*See generally* MSJ Resp.) Moreover, even if Mr. Goon had made such an argument, the court would conclude that it is not clearly established that the provocation rule articulated in *Billington* applies to dogs.  *See Birkes v. Tillamook Cty.*, No. 09-CV-1084-AC, 2011 WL 1792135, at *7 (D. Or. May 10, 2011) ("[N]othing in the cases cited by Plaintiffs suggests that the analysis applied in [*Billington* and related cases] may or should be applied to determining an unlawful seizure allegation based on the shooting of a dog, and none of the cases cited by the parties involving that specific situation cite as a factor whether the officer provoked the dog into the actions which resulted in the officer's decision to shoot the dog.").

unexpected circumstances. The facts articulated by the trial court in *Wickersham* are largely analogous to the facts in this case—at least as they pertain to the second shot fired by Officer Coleman. *See Wickersham*, 2015 WL 224810 at *1-2. In *Wickersham*, a 70-80 pound Doberman ran down stairs at an officer unexpectedly, reached the officer within a couple of seconds, and was only a few feet away when the officer fired the fatal shots. *See id.*; *see also Wickersham*, 694 F. App'x at 560 (concluding that there was no clearly established Fourth Amendment law prohibiting that conduct). Similarly, in *Patino*, the trial court noted that the officer had about five seconds to react to a pit bull that was running at him aggressively, that the other officer on scene also perceived the dog to be a threat, and that the officer shot and killed the dog when it was within two feet of him. *See* 207 F. Supp. 3d at 1164; *Patino*, 706 F. App'x at 427 (concluding that there was no clearly established Fourth Amendment law prohibiting that conduct).

The differences between Officer Coleman's first and second shot prevent this case from being squarely on point with *Wickersham* and *Patino* in the same way that those factual differences prevent this case from being squarely on point with *Criscuolo*. That, however, is the point. Even when the facts are viewed in Mr. Goon's favor, portions of Officer Coleman's conduct bear similarities to conduct that violates clearly established rights related to the use of force against dogs, *see, e.g.*, *Criscuolo*, 540 F. App'x at 563, while other portions of his conduct bear similarities to conduct that does not violate clearly established rights related to the use of force against dogs, *see Wickersham*, 694 F. App'x at 560; *Patino*, 706 F. App'x at 427. Thus, the court concludes that settled law

//

does not "place the lawfulness of the particular [action] beyond debate," which means

that Officer Coleman is entitled to qualified immunity. *See Emmons*, 139 S. Ct. at 504.

Although a "a robust consensus of cases of persuasive authority" can be sufficient

to clearly establish rights, *Tuuamalemalo*, 2019 WL 7161278, at *3, the district court

cases and out-of-circuit cases Mr. Goon cites are not sufficient to change the court's

conclusion that there is no clearly established law prohibiting Officer Coleman's conduct.

(*See* MSJ Resp. at 14-17.)  First, the cases Mr. Goon cites that concluded that a particular

use of force against dogs was unreasonable are factually distinguishable, rendering them

unpersuasive. *See Andrews v. City of W. Branch, Iowa*, 454 F.3d 914, 916 (8th Cir.

2006) (concluding that officer violated the Fourth Amendment by shooting a passive,

fenced-in dog without speaking to the dog's owner, who was a few feet away); *Brown v.*

*Muhlenberg Twp.*, 269 F.3d 205, 209-12 (3d Cir. 2001) (concluding that the officer

violated the Fourth Amendment by shooting a dog five times—including multiple shots

while the dog "tried to crawl away"—where the dog was "10-12 feet away," "stationary

and not growling or barking," "not display[ing] any aggressive behavior . . . and never

tried to attack," and the owner screamed at the officer not to shoot); *Silva v. City of San*

*Leandro*, 744 F. Supp. 2d 1036, 1057 (N.D. Cal. 2010) (concluding that testimony that

officers shot a dog that was "walking behind [his owner] in a manner that was not

aggressive" despite the owner's attempts to "signal[] to the officers to wait so he could

retrain [the dog]" was enough for a reasonable jury to conclude that the officer violated

the Fourth Amendment); *Taylor v. City of Chicago*, No. 09 CV 7911, 2010 WL 4877797,

at *1-3 (N.D. Ill. Nov. 23, 2010) (concluding that plaintiffs had pleaded a plausible

Fourth Amendment claim on a motion to dismiss where allegations showed that officer shot a dog who was "just standing still and wagging his tail," despite the presence of neighbors and a seven-year-old girl and her family who were trying to retrieve the dog and asking the officer not to shoot); *Gaulden v. City of Desloge, Mo.*, No. 4:07CV01637 ERW, 2009 WL 1035346, at *12 (E.D. Mo. Apr. 16, 2009) (concluding that the plaintiff's testimony that her dog was "merely trotting beside" the officer from "several feet away" when the officer shot the dog was sufficient to create a genuine factual dispute that precluded summary judgment); *Kincheloe v. Caudle*, No. A-09-CA-010 LY, 2009 WL 3381047, at *8 (W.D. Tex. Oct. 16, 2009) (concluding that testimony that an officer shot a dog that had not "charged [the officer] or acted aggressively in any manner" as the dog "walk[ed] slowly toward some bushes" created a genuine dispute of material fact that precluded summary judgment).

These cases do not establish a "robust consensus" on the question of whether Officer Coleman's conduct violated clearly established law—which is what the Ninth Circuit requires to find clearly established law in the absence of controlling authority. *See Tuuamalemalo*, 2019 WL 7161278, at *3. There are a number of relevant cases that Mr. Goon does not cite that concluded that officers either did not violate the Fourth Amendment or were entitled to qualified immunity under similar circumstances. *See, e.g.*, *Newman v. Cty. of Fresno*, No. 116CV01099DADBAM, 2018 WL 3533463, at *6 (E.D. Cal. July 20, 2018) ("The court has reviewed the video footage of this incident, and the entire encounter between Deputy Hernandez and the dog lasted only a few seconds. While it is possible the deputy could have readied a different force option prior to

entering the back yard, as suggested by plaintiff's expert . . . , such an action can only be characterized as necessary in hindsight."); *Niesen*, 2016 WL 4126382, at *10 (E.D. Cal. July 5, 2016) ("After the dogs had unexpectedly escaped from the bedroom in which they were confined and barking and were running toward the [d]eputies, a reasonable conclusion of the [d]eputies, if not the only reasonable conclusion, was that the dogs were about to attack the strangers in the [h]ouse."); *Bateman v. Driggett*, No. 11-13142, 2012 WL 2564839, at *8 (E.D. Mich. July 2, 2012) (concluding that an officer did not violate Fourth Amendment where the officer was on a porch for "less than a minute when he saw [p]laintiff's large pit bull run out of the garage directly at him" and the officer shot the dog only after attempting to flee); *Birkes*, 2011 WL 1792135, at *7 (concluding that an officer did not violate the Fourth Amendment when the officer shot a dog that was "five feet away" and "moving toward him in a rapid manner which the dog's guardian could not restrain"); *McCarthy v. Kootenai Cty.*, No. CV08-294-N-EJL, 2009 WL 3823106, at *6 (D. Idaho Nov. 12, 2009) ("The Court finds that a reasonable officer concerned about his personal safety would not have understood that shooting the dog violated a clearly established constitutional right."); *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 273 (D. Conn. 2005) ("[R]easonably competent officers could disagree as to the appropriate course of conduct when faced with the potential harm posed by an unleashed 55-to-60 pound dog running in circles within approximately 15 feet of an officer.").

In sum, the court concludes that there is no "controlling authority or a robust consensus of cases of persuasive authority," *Tuuamalemalo*, 2019 WL 7161278, at *3, that clearly establishes that Officer Coleman's conduct violated the Fourth Amendment.

1 As such, Officer Coleman is entitled to qualified immunity on Mr. Goon's 42 U.S.C. §

2 1983 claim. Thus, the court GRANTS summary judgment in favor of Mr. Coleman on

3 Mr. Goon's Section 1983 claim.

4     4. <u>Mr. Goon's State Law Claims</u>

5     Dismissal of Mr. Goon's § 1983 claim eliminates the only claim that falls within

6 the court's original jurisdiction under 28 U.S.C. § 1331. (*See* Am. Compl. ¶¶ 1, 49-53.)

7 Accordingly, the court has discretion to decline to exercise supplemental jurisdiction over

8 Mr. Goon's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Harrell v. 20th*

9 *Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991); *Schneider v. TRW, Inc.*, 938 F.2d

10 986, 994-95 (9th Cir. 1991). "To decline jurisdiction under § 1367(c)(3), the district

11 court must first identify the dismissal that triggers the exercise of discretion and then

12 explain how declining jurisdiction serves the objectives of economy, convenience and

13 fairness to the parties, and comity." *Trustees of Constr. Indus. & Laborers Health &*

14 *Welfare Tr. v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir.

15 2003). "[I]n the usual case in which all federal-law claims are eliminated before trial, the

16 balance of factors to be considered . . . will point toward declining to exercise jurisdiction

17 over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343,

18 350 n.7 (1988).

19     The court declines to exercise supplemental jurisdiction over the state law claims

20 pursuant to § 1367(c)(3). *See* 28 U.S.C. § 1367(c)(3). Now that the court has granted

21 summary judgment against Mr. Goon's federal claims, all that remains of this case are

22 four Washington state tort claims filed by a Washington resident against a Washington

corrections officer, the Washington DOC, and the State of Washington that arise out of the shooting of a dog that occurred in Washington. (*See* Compl. ¶¶ 50-53.) Thus, comity weighs in favor of dismissing this case so that it may be refiled in state court. *See Newman*, 2018 WL 3533463, at *8 (noting that California-specific claims, defenses, and arguments were "best determined by state courts, since the role of the federal courts in addressing state law claims is to attempt to divine how the California Supreme Court would determine any particular issue"). Moreover, although this case is nearing its trial date, this case is not one where "substantial judicial resources have already been committed" to the state law claims, thereby causing a "duplication of effort." *See Schneider*, 938 F.2d at 994-95. This case has not been heavily litigated. (*See generally* Dkt.) Outside of the current motions, the court has only intervened in one telephonic discovery dispute. (*See* 5/23/19 Min. Entry (Dkt. # 21).) Thus, in sum, this is a Washington-centered case on which the court has expounded little resources, which warrants exercise of the court's § 1367(c) discretion to decline jurisdiction over the pendent state law claims. *See, e.g.*, *Newman*, 2018 WL 3533463, at *8 (dismissing state law claims under § 1367(c)(3) after granting summary judgment on § 1983 claim based on officer's use of force against a dog); *Wickersham*, 2015 WL 224810, at *5 (same); *Dziekan*, 376 F. Supp. 2d at 273 (same). Thus, the court DECLINES to exercise supplemental jurisdiction over Mr. Goon's state law claims and DISMISSES those state law claims without prejudice.

//

//

**B.     Mr. Goon's Motion to Exclude**

Because the court concludes as a matter of law that there is no clearly established law that prohibited Officer Coleman's conduct, *see supra* § III.A.2, the contents of Mr. Berman's report have no impact on the court's determination on summary judgment.  Mr. Berman's report and declaration offer a number of conclusions regarding the reasonableness of Officer Coleman's actions that are allegedly based on Mr. Berman's canine expertise.  (*See* Berman Rpt. (Dkt. # 27) at 23-32; Berman Decl. (Dkt. # 35).) However, the court concludes that summary judgment is warranted because it is not clearly established that Officer Coleman violated the Fourth Amendment.  *See supra* § III.A.3.  Mr. Berman's report is not relevant to that issue, which is why the court did not cite or rely on Mr. Berman's report in reaching its decision.  *See id.*  Thus, the court DENIES as moot Mr. Goon's motion to exclude Mr. Berman.

## IV.     CONCLUSION

For the reasons set forth above, the court GRANTS in part and DECLINES to rule in part on Defendants' motion for summary judgment (Dkt. # 30).  Specifically, the court GRANTS summary judgment on Mr. Goon's 42 U.S.C. § 1983 claim, and DECLINES to rule on Defendants' motion for summary judgment regarding Mr. Goon's state law claims.  Having granted summary judgment on Mr. Goon's only federal claim, the court DECLINES to exercise supplemental jurisdiction over Mr. Goon's remaining state law

//

//

//

claims and therefore DISMISSES the state law claims without prejudice.  Finally, the

court DENIES as moot Mr. Goon's motion to exclude Mr. Berman (Dkt. # 27).

Dated this 21st day of January, 2020.


JAMES L. ROBART
United States District Judge